**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GOLDEN BRIDGE TECHNOLOGY, INC. | ) | |
| | ) | |
| *Plaintiff*, | ) | CA No. |
| | ) | |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| AT&T, INC.; AT&T CORP.; AT&T MOBILITY | ) | |
| LLC; APPLE, INC. and MOTOROLA, INC. | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| | ) | |
| | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

**COMPLAINT**

For its Complaint against AT&T, Inc., AT&T Corp, and AT&T Mobility LLC (collectively, "AT&T"), Apple, Inc. ("Apple") and Motorola, Inc. ("Motorola") (collectively, "Defendants"), Plaintiff Golden Bridge Technology, Inc. ("Plaintiff" or "GBT") alleges as follows:

## THE PARTIES

1.      Plaintiff Golden Bridge Technology, Inc. is a corporation duly organized and existing under the laws of the State of New Jersey, with its principal place of business at 198 Brighton Avenue, Long Branch, New Jersey 07740.  GBT is the owner, by assignment, of all right, title and interest to U.S. Patent No. 6,574,267 B1 ("the '267 patent") (later reexamined and issued as U.S. Patent No. 6,574,267 C1 ("Re '267 patent")) and U.S. Patent No. 7,359,427 B2 ("the '427 patent") (collectively, the Re '267 patent and the '427 patent are referred to as the "Patents-in-Suit").  GBT's ownership of the '267 patent, the Re '267 patent and the '427 patent includes the rights to license the patented technology.

2.      Defendant AT&T, Inc. is a holding company incorporated under the laws of Delaware with its principal executive offices at 208 S. Akard St., Dallas, Texas 75202.  AT&T, Inc.'s registered agent for service of process in Delaware is the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

3.      Defendant AT&T Corp. is a New York corporation with its principal place of business located at 1 AT&T Way, Bedminster, New Jersey 07921.  AT&T Corp.'s registered agent for service of process in Delaware is the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

4.      Defendant AT&T Mobility LLC is the wholly-owned wireless subsidiary of AT&T, Inc. It is a Delaware limited liability company with its principal place of business located at 1025 Lenox Park Blvd., Suite 5D 46, Atlanta, Georgia 30319.  AT&T Mobility LLC's

registered agent for service of process in Delaware is the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

5.      Defendant Apple, Inc. is a California corporation with its principal place of business located at One Infinite Loop, Cupertino, California 95014.  Apple's registered agent for service of process in California is CT Corporation (Agent for Service of Process), 818 W. 7th Street, Suite 200, Los Angeles, California 90017.

6.      Defendant Motorola, Inc. is a Delaware corporation with its principal place of business 1303 East Algonquin Road, Schaumberg, Ill. 60196.  Motorola's registered agent for service of process in Delaware is the Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

## NATURE OF THE ACTION

7.      In this civil action, Plaintiffs seek damages against Defendants for acts of patent infringement in violation of the Patent Act of the United States, 35 U.S.C. §§ 1 et seq.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction of such federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.      Venue is proper under 28 U.S.C. §§ 1391(c) and 1400(b), in that the acts and transactions complained of herein were conceived, carried out, made effective, or had effect within the State of Delaware and within this district, among other places.  On information and belief, Defendants conduct business activities in this judicial district including regularly doing or soliciting business, engaging in conduct and/or deriving substantial revenue from goods and services provided to consumers in the State of Delaware and in this district.  Furthermore, certain of the Defendants, including AT&T Inc., AT&T Corp., AT&T Mobility LLC and Motorola, Inc. are registered to do business with the Delaware Secretary of State.

10.     On information and belief, this Court has personal jurisdiction over the Defendants.  Each of the Defendants conducts continuous and systematic business in Delaware and in this district by offering to sell and/or selling mobile devices and/or 3G wireless services in this State in this district.

## BACKGROUND OF THE DEVELOPMENT OF 3G WIRELESS NETWORKS

11.     The efficiency and quality of the wireless communication networks have seen extraordinary improvements over the past few decades.  Although prototypes of cell phones existed as early as the 1940s, cell phones were not commercially marketed in the United States until the early 1980s.   The first cell phone cost almost $4,000 per unit and operated on an analog network (also known as the First Generation or "1G" network).  Analog networks were notoriously slow and users of the analog networks often experienced distorted voices and call interferences.

12.     In the early 1990s, a set of standards defining the Second Generation or "2G" network was introduced.  The 2G digital network came with many advantages including increasing the capacity of the telecommunications system by allowing digital voice calls to be compressed, thereby using available bandwidth more efficiently.  The 2G network also allowed data transmission, enabling users to transmit text messages from one mobile phone to another mobile phone.

13.     Continued improvements to the 2G network were made, including, for example, the 2.5G network and the 2.75G (EDGE) network, both of which improved upon the abilities to use mobile phones to receive and transmit more advanced types of data including photos, email and the internet.

14.     Today, the third generation of wireless network standards, also known as "3G", has been widely deployed and is currently in use.  A 3G compliant network provides high speed

bandwidth to handheld devices, including mobile phones, as well as other types of transmission/reception devices such as electronic readers, "smart phones", and laptop cards. The 3G network expands the utility of wireless phones and other 3G compatible devices because it allows users to conduct tasks more quickly than in the past, including viewing video, downloading books and magazines, sending and receiving text and multimedia messages, as well as making and receiving voice calls. The advent of the 3G network allows users to watch mobile TV on demand, conduct video conferencing, and utilize location based services which allows users to find businesses or contacts nearby. 3G also allows users to simultaneously use voice and data services, allowing user to browse the internet and conduct a voice call at the same time from the same device.

## THE GLOBAL STANDARDIZATION OF 3G NETWORKS

15.     3G is a compilation of technologies, the standards for which are articulated by the International Telecommunication Union ("ITU"), a global standards setting organization. The ITU, through the International Mobile Telecommunications-2000 (IMT-2000) initiative mandated the necessity of, and the requirements for, a single global wireless standard. Many groups and committees worked together to develop mobile phone systems that are compliant with IMT-2000. Those groups included the Telecommunications Industry Association ("TIA") and the European Telecommunications Standards Institute ("ETSI").

16.     In or around late 1998, various regional standards organizations and committees, including ETSI, formed a standards setting group with the purpose of creating  uniform standards for 3G wireless networks and the Wideband Code Division Multiple Access/Universal Mobile Telecommunications System (known as WCDMA/UMTS or sometimes just UMTS) that were compliant with the IMT-2000. This standards setting organization was named the Third Generation Partnership Project ("3GPP").

17.     Currently, all 3G networks claiming to be UMTS compliant must comply with the IMT-2000 global initiative as articulated by 3GPP.

18.     UMTS improved upon previous platforms by efficiently supporting increased speeds and capacity, thereby allowing even more robust uses of mobile devices.

**GBT'S CONTRIBUTIONS TO THE TELECOMMUNICATIONS STANDARDS REQUIRED BY THE IMT-2000 AND ARTICULATED BY 3GPP FOR 3G NETWORKS**

19.     Each of plaintiff GBT's patents (namely the '267 patent, the Re '267 patent and the '427 patent) relate to 3G networks utilizing UMTS compliant technology.

20.     The technology claimed in the '267 patent, the Re '267 patent and the '427 patent was developed by  GBT, an innovator in the mobile telecommunications field.

21.     Founded in 1995, GBT was formed for the purpose of developing wireless solutions.  Originally, GBT's focus was developing solutions relating to making wireless connections to broadband data networks.

22.     GBT and AT&T worked to develop wireless solutions in the wireless marketplace.  GBT and AT&T cooperated in the development of certain wireless technologies, including a wireless multi-media service using GBT's technology known as Code Division Multiple Access technology or "GB-CDMA".  GBT and AT&T also co-chaired standardization committees together.

23.     In 1998, after the announcement that 3G would be standardized based on UMTS, GBT invested additional resources designed to make the 3G UMTS environment more efficient and faster.

24.      In 2001, many of GBT's technical innovations and contributions were ultimately adopted by 3GPP as an important and necessary part of the 3G and UMTS standards.  3GPP articulated these global standards in several documents, including one document entitled "3GPP;

Technical Specification Group Radio Access Network; Physical Layer Procedures (FDD)", of which there have been several releases.

25.     GBT's contributions to the 3G UMTS global standards greatly enhanced the efficiency with which data could be transmitted and was integral in enabling rapid, efficient connections of UMTS compliant mobile devices to a UMTS compliant 3G network.

26.     As a result of being adopted as part of the standard for 3G and UMTS, certain of GBT's technology is necessarily required for any use of a 3G UMTS compliant mobile device over any 3G UMTS compliant network.

27.     GBT, desiring to protect its technology, sought patents from the United States Patent and Trademark Office.

28.     On March 22, 1999, GBT filed the '267 patent application and on June 3, 2003, the United States Patent & Trademark Office duly and legally issued United States Letters Patent No. 6,574,267 B1 entitled "RACH-RAMP-UP ACKNOWLEDGEMENT" (the "'267 patent"). A true and correct copy of the '267 patent is attached hereto as Exhibit A and incorporated herein by reference.

29.     On December 15, 2009, after a full and fair re-examination of the '267 patent, the United States Patent & Trademark Office duly and legally issued an *Ex Parte* Reexamination Certificate Number 6,574,267 C1 entitled "RACH-RAMP-UP ACKNOWLEDGEMENT".  A true and correct copy of the *Ex Parte* Reexamination Certificate Number 6,574,267 C1 ("Re '267 patent") is attached hereto as Exhibit B.  The '267 and Re '267 patents claim certain of GBT's contributions to the 3G UMTS standards required by the IMT-2000 and articulated by 3GPP.

30.     GBT also filed a continuation of the '267 patent application.  On April 15, 2008, the United States Patent & Trademark Office duly and legally issued United States Letters Patent No. 7,359,427 B2 entitled "RACH RAMP-UP ACKNOWLEDGEMENT" (the "'427 patent").

A true and correct copy of the '427 patent is attached hereto as Exhibit C and is incorporated herein by reference. The '427 patent also claims certain of GBT's contributions to the 3G UMTS standards required by the IMT-2000 and articulated by 3GPP.

31.     As part of its participation in the 3GPP and other groups, including ETSI, GBT agreed to license all intellectual property that is required to practice the UMTS standard under fair, reasonable and non-discriminatory terms.  GBT remains willing to license the Patents-in-Suit pursuant to its agreement.

## GENERAL OVERVIEW OF CELLULAR TELECOMMUNICATIONS SYSTEMS AND THE RELATION TO THE PATENTS-IN-SUIT

32.     At the highest level of operation, a cellular telecommunications system comprises, at least, a mobile station and a base station.

33.     Mobile stations, also known as mobile devices, include cell phones, handsets, smart phones, electronic readers, laptop cards, and other portable devices which enable a user to place and receive calls, send text and multimedia messages, or download or transmit files, media, or other data, among other communication activities.

34.     Base stations, typically located on towers, are dispersed throughout geographic locations.  The mobile stations must communicate with the base stations before the mobile station is allowed access to the cellular network.

35.     The claims of GBT's '267 patent and the Re '267 patent are directed toward components of mobile stations and base stations which are used to establish communication between UMTS compliant mobile stations and UMTS compliant base stations over a wireless communication network.  The Re '267 patent also contains claims directed toward the components of mobile stations which are used to establish communication between UMTS compliant mobile stations and base stations over a wireless communication network.

36.    The claims of GBT's '427 patent are directed toward components of mobile stations which are used to establish communication between UMTS compliant mobile stations and UMTS compliant base stations over a wireless communication network.

## AT&T TOOK AN EARLY LICENSE TO GBT'S 3G TECHNOLOGY, BUT ALLOWED THE LICENSE TO EXPIRE

37.    Beginning in the mid-1990s, GBT and AT&T formed and maintained a close and cooperative relationship, including in areas relating to research and development.  As one example, AT&T and GBT co-chaired certain standards committees together.

38.    As early as December, 1998, AT&T, recognizing the importance of GBT's technology, took a non-exclusive license to all of GBT's present and future intellectual property and certain products ("License Agreement").

39.    The License Agreement, executed in December, 1998 between GBT and AT&T Corporation (a predecessor corporate entity to AT&T) granted AT&T a non-exclusive license to GBT's patents, improvements, know-how, and trade secrets, and provided compensation to GBT in the form of a non-refundable payment, as well as sublicense fees and per unit fees for devices that used GBT's intellectual property.  By its express terms, the License Agreement was valid for five years.

40.    After the License Agreement was signed, many changes took place in the wireless telecommunications industry.  These changes included the announcement of the UMTS standardization process and the development of 3GPP to spearhead and develop the new 3G UMTS standards in accordance with the IMT-2000.  Accordingly, GBT focused its resources on developing efficiencies around the 3G UMTS environment, GBT filed patent applications protecting its developments, and GBT's patented innovations were adopted as a necessary part of the 3G UMTS standard.

41.     AT&T, as a former licensee of GBT's intellectual property and know-how, and also as a major player in the wireless telecommunications market, as well as a close business contact of GBT, was aware of GBT's innovations and the necessity of GBT's patented technology as part of the 3G UMTS global standard.  Nevertheless, AT&T allowed the License Agreement to expire in approximately December, 2003, according to its terms, and did not retain any residual or on-going rights to GBT's intellectual property.

42.     Although AT&T did not seek a new license from GBT, in or about mid-2008, AT&T began to offer a UMTS compliant 3G wireless network in the United States.  AT&T continues to offer its 3G UMTS network in the United States, which must abide by the 3G UMTS standards articulated by 3GPP and required by the IMT-2000.

### DEFENDANT AT&T AND ITS UNAUTHORIZED
### USE OF THE PATENTS-IN-SUIT

43.     AT&T is currently the second largest provider of wireless service in the United States, with over 85.1 million wireless customers, and more than 150 million total customers.  AT&T provides a full range of wireless voice, messaging, and data services to consumer and enterprise customers via its 3G UMTS compliant wireless network.

44.     AT&T offers its 3G wireless network in more than 360 U.S. major metropolitan areas and AT&T publicly touts that it maintains the nation's fastest 3G network, serving 85.1 million customers and enabling them to travel and communicate seamlessly with the best worldwide wireless coverage.

45.     AT&T advertises on its website the benefits of its 3G network by stating that 3G provides accelerated data speeds and simultaneous voice and data capabilities "for an amazing wireless voice and data experience."  Furthermore, AT&T also states that its 3G network allows the user: (1) faster access for on-demand viewing of high quality video clips from TV shows,

news, sport and weather; (2) to surf the wireless Internet faster and significantly shorten the wait for page loads; (3) to download files and access email faster from providers like Yahoo!, MSN, and AOL; (4) to multi-task while on a call—search for movies times, look up directions, or send messages; and (5) to get more done with faster access to email and Internet.

46.     The AT&T 3G network uses UMTS technology.  In fact, AT&T states on its website that "the AT&T 3G network uses HSDPA/UMTS technology (High Speed Downlink Packet Access/Universal Mobile Telephone System), which makes it possible to enjoy a variety of feature-rich wireless services. It also gives AT&T the advantage of offering simultaneous voice and data services. That means you can talk and use the Internet at the same time. How's that for multitasking?"

47.     AT&T's 3G wireless network utilizing UMTS technology has enjoyed great success.  Total wireless revenues for 2008 were $49.335 billion.

48.     In order to offer AT&T's 3G UMTS wireless communication network, AT&T must necessarily practice the standards articulated by 3GPP, which are compliant with the IMT-2000.

49.     AT&T makes, uses, offers for sale and/or sells its 3G UMTS wireless communication network to consumers and subscribers within the United States.

50.     To provide its 3G UMTS wireless communications network to customers throughout the United States, AT&T operates base stations and base station controllers throughout the United States.  These base stations and base station controllers are compliant with UMTS standards articulated by 3GPP and required by the IMT-2000.

51.      AT&T also manufactures and offers for sale AT&T branded UMTS compliant mobile devices which plug into the USB port of a computer, which are configured to allow a laptop user to connect the laptop to AT&T's 3G UMTS compliant network.  AT&T states on its

website that  "AT&T LapTopConnect gives you the power of the AT&T network while you're

on the go." These mobile devices sold by AT&T include USBConnect Turbo, USBConnect

Velocity, USBConnect Mercury, USBConnect Lightning.

52.     In addition to AT&T's own branded mobile devices that allow laptop

connectivity, a number of other mobile devices are specifically configured to connect to AT&T's

UMTS compliant 3G network.  These mobile devices are manufactured under the brand names

of various other companies, including Apple, and are sold both through the manufacturer (such

as Apple) or through AT&T itself.

53.     At least as early as April 15, 2009, GBT contacted AT&T by letter, informing

AT&T that certain of GBT's patented technology was required by the standard articulated by

3GPP.  GBT offered AT&T the opportunity to once again license GBT's patents. GBT further

informed AT&T that the '267 patent had recently emerged from reexamination, and GBT

provided AT&T with a copy of the '427 patent.

54.     To date, AT&T continues to offer its 3G UMTS compliant wireless network to

the public for a fee and also continues to sell mobile devices that are configured to connect to

AT&T's UMTS compliant 3G wireless network.

55.     AT&T has not, to date, taken a license or otherwise obtained GBT's permission to

use GBT's patented technology.

**DEFENDANT APPLE, INC. AND ITS UNAUTHORIZED USE OF
THE PATENTS-IN-SUIT**

56.     Apple is a leader in providing user-friendly mobile devices to the public.  Apple's

most well-known products include mobile music players, personal computers and laptops, and

the iPhone.

57.     The iPhone, first introduced in 2007, provided users easy access to an interface which allowed users to not only make phone calls easily but also to play games, take and send photographs, and play music, among other functions.

58.     On June 11, 2008, Apple released the iPhone 3G, which operated exclusively on AT&T's 3G network, utilizing UMTS compliant technology.  The iPhone 3G supports faster 3G data speeds via UMTS compliant technology and quickly became a favorite among AT&T wireless services subscribers.

59.     In 2009, Apple released the iPhone 3GS, which continues to operate on AT&T's UMTS compliant 3G network but sported upgrades and improvements, including a video camera, as compared to the iPhone 3G.

60.     To date, Apple continues to make, offer for sale, and sell mobile devices   that are specifically configured to connect to AT&T's UMTS compliant 3G wireless network, including the Apple iPhone 3G and the iPhone 3GS, and, as of March, 2010, a mobile reader with a 3G connectivity option marketed as the Apple iPad.  Millions of the iPhone 3G and 3GS are active in the U.S. alone and the iPhone continues to increase in popularity.  Apple reportedly sold 8.75 million iPhones in the first quarter of 2010 alone – more than double the number of phones sold the year before.

61.     Since the Apple iPhone has been offered to the public, Apple and AT&T have maintained an exclusive contract as to the U.S. sales of the Apple iPhone 3G and 3GS.  The exclusive contract requires that AT&T's UMTS compliant 3G network be the only network on which the Apple iPhone UMTS compliant 3G and 3GS may operate.  Therefore, all UMTS compliant 3G and 3GS Apple iPhones made for, offered for sale, or sold in the United States are made specifically to connect to AT&T's UMTS compliant 3G network.

62.     This exclusive contract between Apple and AT&T has resulted in a large number of wireless subscribers desiring the Apple iPhone to move from other networks (such as Verizon, for example) to AT&T.  It is reported that 4.3 million subscribers switched to the iPhone in the second half of 2008 alone, and 40% of those subscribers were new to AT&T.

63.     At least as early as April 15, 2009, GBT contacted Apple by letter, informing Apple that certain of GBT's patented technology was required by the standard articulated by 3GPP, and offering Apple the opportunity to license GBT's patents. GBT's letter explained that the '267 patent had recently emerged from reexamination.  GBT further enclosed a copy of the '427 patent with its letter.

64.     Apple has not, to date, taken a license or otherwise obtained GBT's permission to use GBT's patented technology.

### DEFENDANT MOTOROLA, INC. AND ITS UNAUTHORIZED USE OF THE PATENTS-IN-SUIT

65.     Defendant Motorola is a Fortune 100 telecommunications company based in Schaumburg, Illinois. It is a manufacturer of cellular phones, as well as many other products.

66.     Motorola makes, sells, offers for sale and/or imports certain mobile stations which are configured to allow connection to 3G UMTS compliant wireless networks, including those 3G UMTS compliant wireless networks offered to consumers in the United States by AT&T and also T-Mobile.  Those mobile stations manufactured by Motorola that are configured to allow connection to AT&T's 3G UMTS compliant wireless network include the Motorola Tundra, Backflip and Karma devices.  Those mobile stations manufactured by Motorola that are configured to allow connection to T-Mobile's 3G UMTS compliant wireless network include the Cliq XT device.

67.     At least as early as April 15, 2009, GBT contacted Motorola by letter, informing Motorola that certain of GBT's patented technology was required by the standard articulated by

3GPP and offering Motorola the opportunity to license GBT's patents. GBT stated that the '267 patent had recently emerged from reexamination and also enclosed a copy of the '427 patent.

68.     Motorola has not, to date, taken a license or otherwise obtained GBT's permission to use GBT's patented technology.

## FIRST CLAIM FOR RELIEF AGAINST AT&T  FOR INFRINGEMENT OF U.S. PATENT NO.  6,574,267 C1

69.     Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1-68 of this Complaint as though fully set forth herein.

70.     Plaintiff GBT is the owner by assignment of the entire right, title, and interest, including the right to enforce the Re '267 patent.

71.     AT&T has directly infringed and continues to directly infringe the Re '267 patent by making, using, selling, or offering for sale in or importing into the United States the base stations and/or base station processors used in AT&T's UMTS compliant 3G wireless communication network which embody or otherwise practice one or more of the claims of the Re '267 patent.

72.     AT&T  has directly infringed and continues to directly infringe the Re '267 patent by making, using, selling, or offering for sale in or importing into the United States the mobile station devices used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practices one or more of the claims of the Re '267 patent. These mobile devices include but are not limited to AT&T's USBConnect Turbo, USBConnect Velocity, USBConnect Mercury and  USBConnect Lightning.

73.     AT&T has indirectly infringed and continues to indirectly infringe the Re '267 patent by actively inducing direct infringement by other persons who make, use, sell or offer for sale or import into the United States mobile station devices configured to be used within

AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practice one or more of the claims of the Re '267 patent.   At the time of AT&T's conduct, AT&T had knowledge of the Re '267 patent, knew or should have known that its actions would induce direct infringement by others, and intended that its actions would induce direct infringement by others.

74.      As a direct and proximate result of AT&T's infringement of the Re '267 patent, Plaintiffs have been and continues to be damaged in an amount yet to be determined.

75.      AT&T has actual notice of the Re '267 patent owned by GBT.

76.      AT&T has not had, nor does it have a reasonable basis for believing that it had or has the right to engage in the acts complained of herein.

77.      AT&T's infringement has been willful and deliberate, making this an exceptional case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 3.5 U.S.C. § 285.

**SECOND CLAIM FOR RELIEF AGAINST AT&T FOR
INFRINGEMENT OF U.S. PATENT NO.  7,359,427 B2**

78.      Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1-77 of this Complaint as though fully set forth herein.

79.      Plaintiff GBT is the owner by assignment of the entire right, title, and interest, including the right to enforce the '427 patent.

80.      AT&T  has directly infringed and continues to directly infringe the '427 patent by making, using, selling, or offering for sale in or importing into the United States the mobile station devices used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practices one or more of the claims of the '427 patent. These

mobile devices include but are not limited to AT&T's USBConnect Turbo, USBConnect Velocity, USBConnect Mercury and  USBConnect Lightning.

81.     AT&T has indirectly infringed and continues to indirectly infringe the '427 patent by actively inducing direct infringement by other persons who make, use, sell or offer for sale or import into the United States mobile station devices configured to be used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practice one or more of the claims of the '427 patent.   At the time of AT&T's conduct, AT&T had knowledge of the '427 patent, knew or should have known that its actions would induce direct infringement by others, and intended that its actions would induce direct infringement by others.

82.     As a direct and proximate result of AT&T's infringement of the '427 patent, Plaintiffs have been and continues to be damaged in an amount yet to be determined.

83.     AT&T has actual notice of the '427 patent owned by GBT.

84.     AT&T has not had, nor does it have a reasonable basis for believing, that it had or has the right to engage in the acts complained of herein.

85.     AT&T's infringement has been willful and deliberate, making this an exceptional case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 3.5 U.S.C. § 285.

**THIRD CLAIM FOR RELIEF AGAINST APPLE AND MOTOROLA FOR INFRINGEMENT OF U.S. PATENT NO. 6,574,267 C1**

86.     Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1-85 of this Complaint as though fully set forth herein.

87.     Plaintiff GBT is the owner by assignment of the entire right, title, and interest, including the right to enforce the Re '267 patent.

88.     Apple has directly infringed and continues to directly infringe the Re '267 patent by making, using, selling, or offering for sale in or importing into the United States mobile station devices used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practices one or more of the claims of the Re '267 patent. These mobile devices include but are not limited to the Apple iPhone 3G and the Apple iPhone 3GS and the Apple iPad, which can be purchased with a 3G connectivity option.

89.     Motorola has directly infringed and continues to directly infringe the Re '267 patent by making, using, selling, or offering for sale in or importing into the United States mobile station devices used within UMTS compliant 3G wireless communication networks, which embodies or otherwise practices one or more of the claims of the Re '267 patent. These mobile devices include but are not limited to the Tundra, Backflip, Karma and CliqXT devices.

90.     Apple has indirectly infringed and continues to indirectly infringe the Re '267 patent by actively inducing direct infringement by other persons in the United States who use mobile station devices configured to be used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practices one or more of the claims of the Re '267 patent.  These mobile devices include but are not limited to the Apple iPhone 3G and the Apple iPhone 3GS and the Apple iPad, which can be purchased with a 3G connectivity option. At the time of Apple's conduct, Apple had knowledge of the Re '267 patent, knew or should have known that its actions would induce direct infringement by others, and intended that its actions would induce direct infringement by others.

91.     Motorola has indirectly infringed and continues to indirectly infringe the Re '267 patent by actively inducing direct infringement by other persons in the United States who use mobile station devices configured to be used within UMTS compliant 3G wireless communication networks, which embodies or otherwise practices one or more of the claims of

the Re '267 patent.  These mobile devices include but are not limited to the Tundra, Backflip,

Karma and CliqXT devices.  At the time of Motorola's conduct, Motorola had knowledge of the

Re '267 patent, knew or should have known that its actions would induce direct infringement by

others, and intended that its actions would induce direct infringement by others.

92.     As a direct and proximate result of Apple's infringement of the Re '267 patent,

Plaintiffs have been and continues to be damaged in an amount yet to be determined.

93.     As a direct and proximate result of Motorola's infringement of the Re '267 patent,

Plaintiffs have been and continues to be damaged in an amount yet to be determined.

94.     Apple has actual notice of the Re '267 patent owned by GBT.

95.     Motorola has actual notice of the Re '267 patent owned by GBT.

96.     Apple has not had, nor does it have a reasonable basis for believing that it had or

has the right to engage in the acts complained of herein.

97.     Motorola has not had, nor does it have a reasonable basis for believing that it had

or has the right to engage in the acts complained of herein.

98.     Apple's infringement has been willful and deliberate, making this an exceptional

case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees

pursuant to 3.5 U.S.C. § 285.

99.     Motorola's infringement has been willful and deliberate, making this an

exceptional case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and

attorneys' fees pursuant to 3.5 U.S.C. § 285.

**FOURTH CLAIM FOR RELIEF AGAINST APPLE AND MOTOROLA FOR
INFRINGEMENT OF U.S. PATENT NO.  7,359,427 B2**

100.     Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1-

99 of this Complaint as though fully set forth herein.

101.    Plaintiff GBT is the owner by assignment of the entire right, title, and interest, including the right to enforce the '427 patent.

102.    Apple has directly infringed and continues to directly infringe the '427 patent by making, using, selling, or offering for sale in or importing into the United States mobile station devices used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practices one or more of the claims of the '427 patent. These mobile devices include but are not limited to the Apple iPhone 3G and the Apple iPhone 3GS and the Apple iPad, which can be purchased with a 3G connectivity option.

103.    Motorola has directly infringed and continues to directly infringe the '427 patent by making, using, selling, or offering for sale in or importing into the United States mobile station devices used within UMTS compliant 3G wireless communication networks, which embodies or otherwise practices one or more of the claims of the '427 patent. These mobile devices include but are not limited to the Tundra, Backflip, Karma and CliqXT devices.

104.    Apple has indirectly infringed and continues to indirectly infringe the '427 patent by actively inducing direct infringement by other persons in the United States who use mobile station devices configured to be used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practices one or more of the claims of the '427 patent.  These mobile devices include but are not limited to the Apple iPhone 3G and the Apple iPhone 3GS and the Apple iPad, which can be purchased with a 3G connectivity option. At the time of Apple's conduct, Apple had knowledge of the '427 patent, knew or should have known that its actions would induce direct infringement by others, and intended that its actions would induce direct infringement by others.

105.    Motorola has indirectly infringed and continues to indirectly infringe the '427 patent by actively inducing direct infringement by other persons in the United States who use

mobile station devices configured to be used within UMTS compliant 3G wireless communication networks, which embodies or otherwise practices one or more of the claims of the '427 patent.  These mobile devices include but are not limited to the Tundra, Backflip, Karma and CliqXT devices.  At the time of Motorola's conduct, Motorola had knowledge of the '427 patent, knew or should have known that its actions would induce direct infringement by others, and intended that its actions would induce direct infringement by others.

106.    As a direct and proximate result of Apple's infringement of the '427 patent, Plaintiffs have been and continues to be damaged in an amount yet to be determined.

107.    As a direct and proximate result of Motorola's infringement of the '427 patent, Plaintiffs have been and continues to be damaged in an amount yet to be determined.

108.    Apple has actual notice of the '427 patent owned by GBT.

109.    Motorola has actual notice of the '427 patent owned by GBT.

110.    Apple has not had, nor does it have a reasonable basis for believing that it had or has the right to engage in the acts complained of herein.

111.    Motorola has not had, nor does it have a reasonable basis for believing that it had or has the right to engage in the acts complained of herein.

112.    Apple's infringement has been willful and deliberate, making this an exceptional case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 3.5 U.S.C. § 285.

113.    Motorola's infringement has been willful and deliberate, making this an exceptional case and justifying the award of treble damages pursuant to 35 U.S.C. § 284 and attorneys' fees pursuant to 3.5 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against each Defendant as follows:

1.      For a judicial determination and declaration that each of the AT&T, Apple and Motorola has infringed and continues to infringe the Patents-in-Suit by making, using, importing, offering for sale, and/or selling mobile devices that are used to connect to UMTS compliant 3G wireless networks in the United States.

2.      For a judicial determination and declaration that AT&T induces direct infringement of the Patents-in-Suit by other persons who make, use, sell or offer for sale or import into the United States mobile station devices configured to be used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practice one or more of the claims of the Patents-in-Suit, including the Apple iPhone 3G and 3GS and the Apple iPad;

3.      For a judicial determination and declaration that AT&T has infringed and continues to infringe the Re '267 Patent by making, using, selling, or offering for sale in or importing into the United States the base stations and/or base station processors used in AT&T's 3G wireless communication network, which embody or otherwise practice one or more of the claims of the Re '267 patent;

4.      For a judicial determination and declaration that Apple induces direct infringement of the Patents-in-Suit by other persons who use in the United States mobile station devices configured to be used within AT&T's UMTS compliant 3G wireless communication network, which embodies or otherwise practice one or more of the claims of the Patents-in-Suit, including the Apple iPhone 3G and 3GS and the Apple iPad;

5.      For a judicial determination and declaration that Motorola induces direct infringement of the Patents-in-Suit by other persons who use in the United States mobile station

devices configured to be used within UMTS compliant 3G wireless communication networks, which embodies or otherwise practice one or more of the claims of the Patents-in-Suit, including but not limited to the Tundra, Backflip, Karma and CliqXT devices;

6.      For a judicial determination and decree that each of the Defendants' infringement of the Patents-in-Suit is willful;

7.      For damages resulting from each of the Defendants' past and present infringement of the Patents-in-Suit and the trebling of such damages because of the willful and deliberate nature of its infringement;

8.      For a declaration that this is an exceptional case under 35 U.S.C. § 285 and for an award of attorneys' fees and costs in this action;

9.      For an assessment of prejudgment interest; and

10.     For such other and further relief as the Court may deem just and proper under the circumstances.

DATED:      May 21, 2010          _/s/David J. Margules_____
                                  David J. Margules (#2254)
                                  Sean M. Brennecke (#4686)
                                  BOUCHARD, MARGULES
                                    & FRIEDLANDER, P.A.
                                  222 Delaware Ave., Suite 1400
                                  Wilmington, Del. 19801
                                  (302) 573-3500 - Telephone
                                  (302) 573-3501 – Facsimile
                                  dmargules@bmf-law.com
                                  sbrennecke@bmf-law.com

                                  Roderick G. Dorman
                                  Lawrence M. Hadley
                                  Hazim Ansari
                                  Mieke K. Malmberg
                                  Bryan L. Yates
                                  HENNIGAN, BENNETT & DORMAN LLP
                                  865 South Figueroa Street, Suite 2900
                                  Los Angeles, California 90017
                                  (213) 694-1200 - Telephone
                                  (213) 694-1234 – Facsimile
                                  dormanr@hbdlawyers.com
                                  hadleyl@hbdlawyers.com
                                  ansarih@hbdlawyers.com
                                  malmbergm@hbdlawyers.com
                                  yatesb@hbdlawyers.com

                                  *Attorneys for Plaintiff Golden Bridge Technology, Inc.*

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial pursuant to Rule 38 of the Federal Rules of Civil

Procedure as to all issues in this lawsuit.


Dated: May 21, 2010


    */s/David J. Margules*     
David J. Margules (#2254)
Sean M. Brennecke (#4686)
BOUCHARD, MARGULES
  & FRIEDLANDER, P.A.
222 Delaware Ave., Suite 1400
Wilmington, Del. 19801
(302) 573-3500 - Telephone
(302) 573-3501 – Facsimile
dmargules@bmf-law.com
sbrennecke@bmf-law.com

Roderick G. Dorman
Lawrence M. Hadley
Hazim Ansari
Mieke K. Malmberg
Bryan L. Yates
HENNIGAN, BENNETT & DORMAN LLP
865 South Figueroa Street, Suite 2900
Los Angeles, California 90017
(213) 694-1200 - Telephone
(213) 694-1234 – Facsimile
dormanr@hbdlawyers.com
hadleyl@hbdlawyers.com
ansarih@hbdlawyers.com
malmbergm@hbdlawyers.com
yatesb@hbdlawyers.com

*Attorneys for Plaintiff Golden Bridge Technology, Inc.*