IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GOLDEN BRIDGE TECHNOLOGY, INC. | ) | |
| | ) | PUBLIC VERSION |
| Plaintiff, | ) | |
| | ) | C.A. No. 10-428-SLR |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| APPLE INC., et al. | ) | ███████████████ |
| | ) | ███████████████ |
| Defendants. | ) | ███████████████ |
| | ) | ████████ |

## PLAINTIFF GOLDEN BRIDGE TECHNOLOGY, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

McCARTER & ENGLISH, LLP

Michael P. Kelly (# 2295)
Daniel M. Silver (# 4758)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
*mkelly@mccarter.com*
*dsilver@mccarter.com*

Mark D. Giarratana
Eric E. Grondahl
CityPlace I
185 Asylum Street
Hartford, CT 06103
(860) 275-6700
*mgiarratana@mccarter.com*
*egrondahl@mccarter.com*

*Attorneys for Golden Bridge Technology,
Inc.*

KLEHR HARRISON HARVEY
BRANZBURG LLP

David S. Eagle (#3387)
Sean M. Brennecke (#4686)
919 Market Street, St. 1000
Wilmington, DE 19801
(302) 552-5518
*deagle@klehr.com*
*sbrennecke@klehr.com*

*Attorneys for Golden Bridge Technology,
Inc. with respect to claims asserted against
Amazon.com, Inc., Hewlett-Packard
Company and Palm, Inc.*

Dated: October 24, 2012

Public Version Filed: October 26, 2012

# TABLE OF CONTENTS

**Page**

I.  NATURE AND STAGE OF THE PROCEEDINGS ...........................................................1

II.  SUMMARY OF ARGUMENT ...........................................................................................1

III.  BACKGROUND ................................................................................................................2

    A.  The Patents-in-Suit....................................................................................................3

    B.  Mobile Phones and the RACH Procedure ................................................................4

    C.  Development of the Invention of the Patents-in-Suit ...............................................5

    D.  The Prior Litigation in Texas, the Reexamination of the '267 Patent and the Issuance of the '427 Patent. .............................................................................8

IV.  LEGAL STANDARDS ......................................................................................................8

V.  ARGUMENT .....................................................................................................................9

    A.  Access Preamble/Preamble ......................................................................................9

        1.  The Prosecution History Disclaims Message Data from the Access Preamble/Preamble Limitation.....................................................................10

        2.  Apple's Expert Agrees that the Prosecution History Disclaims Message Data from the Access Preamble/Preamble Limitation .................12

        3.  GBT's Construction is Reinforced by the Language of the Claims and the Specification .....................................................................................14

        4.  This Court is Not Bound by the Construction of Access Preamble/Preamble Stipulated Before the Texas Court.............................17

        5.  Defendants' Proposed Construction of Access Preamble/Preamble would Render the "Spreading" Limitation Superfluous, or Impermissibly Introduce a "Spreading" Step Where it does not Exist.................................................................................................................21

    B.  Packet Data .............................................................................................................22

    C.  Discrete Power Level..............................................................................................23

        1.  Defendants cannot Import the "Constant" Aspect of the Preferred Embodiment into the "Discrete Power Level" Limitation .........................24

2.     The Texas Court did not Construe "Discrete" to Mean "Constant Distinct" but rather Used the Plain and Ordinary Meaning ........................26

D.     "If no [acknowledgement/layer one acknowledgement] corresponding to the access preamble is detected, transmitting . . ." and "transmitting a spread access preamble . . . if no layer one acknowledgement corresponding to any of the preamble transmissions is received"........................27

VI.     CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*3M Innovative Props. Co. v. Louis M. Gerson Co., Inc.*,
No. 08-4960, 2010 WL 4106712 (D. Minn. Oct. 12, 2010) ....................................................24

*Abbott Labs. v. Baxter Pharm. Prods., Inc.*,
334 F.3d 1274 (Fed. Cir. 2003)...........................................................................................27

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003)...........................................................................................15

*AIA Eng'g Ltd. v. Maggoteaux Int'l S/A*,
657 F.3d 1264 (Fed. Cir. 2011)...........................................................................................17

*Alexam, Inc. v. Best Buy Co., Inc.*,
No. 2:10cv93, 2012 WL 1188406 (E.D. Tex. Apr. 9, 2012) ...............................................19

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*,
435 F.3d 1356 (Fed. Cir. 2008)...........................................................................................19

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008)....................................................................................10, 29

*Cross Atlantic Capital Partners, Inc. v. Facebook, Inc.*,
No. 07-2768, 2011 WL 941870 (E.D. Pa. Mar. 17, 2011) ...................................................17

*Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*,
672 F.3d 1270 (Fed. Cir. 2012)....................................................................................15, 21

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
527 F.3d 1318 (Fed. Cir. 2008)...........................................................................................18

*Graco Children's Prods., Inc. v. Regalo Int'l, LLC*,
77 F. Supp. 2d 660 (E.D. Pa. 1999) ....................................................................................20

*Home Diagnostics, Inc. v. Lifescan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004)...........................................................................................15

*Howard Hess Dental Labs. Inc. v. Dentsply Intern. Inc.*,
602 F.3d 237 (3d Cir. 2010)................................................................................................18

*ICU Med., Inc. v. Rymed Techs., Inc.*,
364 Fed. Appx. 622, 2010 WL 375140 (Fed. Cir. 2010).......................................................20

*Kinetic Concepts, Inc. v. Blue Sky Med. Group*,
   554 F.3d 1010 (Fed. Cir. 2009)......................................................................................17

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004).......................................................................................22

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).......................................8

*MySpace Inc. v. GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012).................................................................................22, 26

*Omega Eng'g, Inc. v. Raytek Co.*,
   334 F.3d 1314 (Fed. Cir. 2003).............................................................................10, 12, 13

*On Demand Mach. Corp. v. Ingram Indus.*,
   442 F.3d 1331 (Fed. Cir. 2006).......................................................................................9

*Orion IP, LLC v. Staples, Inc*.,
   406 F. Supp. 2d 717 (E.D. Tex. 2005).............................................................................24

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................................. *passim*

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   No. 08-309, 2009 WL 4928029 (D. Del. Dec. 18, 2009) .................................................19, 20

*Southwall Techs, Inc. v. Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995).......................................................................................14

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
   164 F.3d 1372 (Fed. Cir. 1998).......................................................................................10

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997).......................................................................................23

*Ultradent Products v. Hayman*,
   No. 00-13402, 2002 WL 34477127 (C.D. Cal. Jan. 11, 2002) ................................................17

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007).......................................................................................23

*Zircon Corp. v. Stanley Black & Decker, Inc*.,
   452 Fed. Appx. 966 (Fed. Cir. 2011)...............................................................................12

## I.     NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Golden Bridge Technology ("GBT") brought this action against Apple, Inc. ("Apple") and other Defendants in 2010, alleging infringement of U.S. Patent Nos. 6,574,267 (reexamined) and 7,359,427.   GBT filed a related case in 2011 against numerous other Defendants asserting the same patents-in-suit, C.A. No. 11-165-SLR.   Shortly thereafter, the parties stayed both cases to pursue mediation, which resulted in the dismissal of several Defendants.

In February 2012, this Court held a status conference in both cases to discuss scheduling, and thereafter the parties jointly proposed a procedure and schedule pursuant to which GBT would proceed to trial against Apple in April 2013, and GBT's claims against all other Defendants would be stayed.   In order to alleviate the burden of multiple claim construction proceedings, the parties agreed upon and the Court approved a procedure by which all Defendants other than Apple could participate in claim construction at their election.   Several Defendants have elected to participate in claim construction, and the parties filed a Joint Claim Construction Chart on July 19, 2012 [D.I. 193].   This is GBT's Opening Claim Construction Brief.

## II.     SUMMARY OF ARGUMENT

The parties have successfully narrowed down the number of claim terms in dispute to only a handful.   With regard to those claim terms that remain in dispute, GBT has proposed constructions (where necessary) that are amply supported by the language of the claims, the specification, or the prosecution history, as required by *Phillips* and its progeny.   Where appropriate, GBT has argued that the claim term should be afforded its plain and ordinary meaning, because no special construction is required.   In sum, GBT submits the Court should adopt its proposed constructions for the following reasons:

1.      The "access preamble/preamble" limitation is properly construed to exclude message data.  During prosecution of the '267 patent reexamination, GBT unambiguously disclaimed message data from this limitation in order to distinguish prior art and overcome claim rejections.  Apple's own expert witness agrees the passages in the prosecution history are understood by persons skilled in the art to exclude message data from the claimed preamble. The stipulated construction of this limitation before a federal court in Texas in 2005 is not binding on this Court because the prior suit involved different claims, it occurred before issuance of the '427 patent and '267 reexamination certificate, and did not consider the prosecution of the '267 reexamination which dictates a different claim construction.

2.      The "discrete power level" limitation is properly construed in accordance with its plain meaning.  Apple attempts to impermissibly read into this limitation the "constant power level" of a preferred embodiment.  But in stark contrast to the "access preamble/preamble" limitation, the prosecution history and patent specification consistently use this limitation in accordance with its plain meaning, and do not assign a special meaning to, or disavow from this limitation power levels that are not constant throughout the preamble.

3.      The limitation "if no layer one acknowledgement . . . is detected, transmitting a spread access preamble . . . at a second discrete power level …" is properly construed to require a "set time" between preamble transmissions.  During prosecution, GBT clearly and unambiguously defined this limitation to include a set time between preamble transmissions in order to distinguish prior art and overcome claim rejections.

## III.   BACKGROUND

GBT was founded in 1995 to develop wireless telecommunication solutions, including those employing Wideband Code Division Multiple Access (W-CDMA) technology.  (JA-1848-49).  CDMA technology allows several users to transmit information over a single

2

communication channel and share a band of frequencies. (JA-1856-57). Mobile wireless stations ("MS"), such as cellular phones, transmit information to a base station ("BS"). (JA-1854-55). The BS communicates with a controller that routes the information for transmission to the intended recipient. Codes are used by each MS to allow multiple users to transmit over the same channel to a BS. (JA-1856-57). The BS is able to identify which MS sent the information based upon the code used. This allows for increased capacity on a cellular communication system.[1]

By 1998, GBT had approximately 20 employees. (JA-1848-49). Dr. Emmanuel Kanterakis and Dr. Kourosh Parsa are the inventors of the patents-in-suit and were employees of GBT at the time of their invention. *Id*. In early 1998, GBT became involved in efforts to develop a third-generation ("3G") wireless standard through its participation on a committee, the TR 46.1 Committee, which was organized through the Telecommunications Industry Association. (JA-1846). Other committee participants included AT&T Laboratories, Ericsson, Lucent Technologies, Nokia and others. *Id*. Dr. Parsa, a GBT employee, was a key participant in this project, and served as chairman of a subcommittee. (JA-1847). GBT was instrumental in developing portions of what the Third Generation Partnership Project ("3GPP") ultimately promulgated as its 3G W-CDMA/UMTS standard, which requires the invention of the patents-in-suit.

A.      **The Patents-in-Suit**

U.S. Patent No. 6,574,267 B1 ("the '267 patent"), entitled "RACH Ramp-Up Acknowledgement," issued to GBT (as assignee) on June 3, 2003 with 29 claims. The '267

---

[1] As stated by Apple's expert, "with CDMA, all users send all of the time using all of the radio bandwidth but, since each is marked by a unique CDMA code, the signals are nonetheless distinguishable. CDMA has been likened to a room filled with multiple people, each speaking a different language. Even though the room is noisy, one can still understand someone speaking in your own language." (JA-1851, ¶¶ 49-50).

patent later underwent reexamination by the U.S. Patent and Trademark Office ("PTO"), which issued a Reexamination Certificate on December 15, 2009. At the conclusion of the reexamination, the patentability of claims 1-12 and 27-29 was confirmed, and new claims 30-60 were added and determined to be patentable. Claims 13-26 of the originally issued patent were cancelled. GBT asserts that claims 42-44, 50-52, and 58-60 of the '267 patent are infringed by various Apple devices. All of the asserted claims of the '267 patent were added during the reexamination.

U.S. Patent No. 7,359,427 B2 ("the '427 patent") is a continuation of the '267 patent and therefore has the same figures and nearly identical written description as the '267 patent, but it has a distinct set of claims. The '427 patent issued to GBT (as assignee) on April 15, 2008. GBT asserts that various Apple devices infringe claims 9, 10, 14-22, 24, and 26-28 of the '427 patent. The '267 and '427 patents are collectively referenced herein as the "patents-in-suit."

**B.     Mobile Phones and the RACH Procedure**

The patents-in-suit are directed to, *inter alia*, MS, such as mobile phones, smartphones and tablets, and methods for connecting MS to wireless cellular networks. An exemplary wireless cellular system is illustrated below, and includes three BS towers and a few MS within the coverage area of each respective BS. (JA-1854-55, ¶ 20). The coverage area of a respective BS is often referred to as a "cell." *Id*. On a per need basis, an MS can communicate over radio links with the BS in the cell to conduct a call or transmit other data. *Id*.



In order to establish a communication link with a BS, the MS must send a signal at a power level sufficient to be detected by the BS over a Random Access Channel, or "RACH." (JA-1861-62, ¶¶ 50-51).   If the MS initially transmits at a power level that is higher than necessary for the BS to detect the signal, the MS can drown out other MS within the cell, which may also be trying to make a connection.   One way to prevent this is to initially transmit at a power level that may be slightly lower than required to establish a connection, and to repeat the transmission at increasing power levels until the signal is detected by the BS.   This approach must be balanced with the desire for the MS to establish communication with the BS as rapidly as possible.

## C.    Development of the Invention of the Patents-in-Suit

In early 1998, Drs. Parsa and Kanterakis recognized that the prior art RACH procedure was relatively slow and inefficient and they were focused on improving it and "coming up with a

drastically new, faster, efficient, more capacity, higher through put access in the CDMA system[.]" (JA-1881 at 42:8-11, 15-18). With that goal in mind, the inventors developed a substantially faster, more efficient RACH procedure.

In the prior art IS-95 procedure, the MS transmitted a relatively long access probe that included a preamble together with message data. (JA-437-40). The access probe was first transmitted at a power level that was intended to be below that required for detection by the BS. If the MS did not receive a signal from the BS indicating that the BS had received the access probe, a second access probe was sent by the MS at a higher power level. *Id*. This process continued until the MS received an acknowledgement that an access probe had been detected by the BS. In this prior art process, the acknowledgement signal indicated that the message data sent as part of the access probe had been correctly detected. Thus, in order to be detected by a BS, the prior art access probes (comprising a preamble and message data together) had to be processed by the BS at layer two or above, and could not be acknowledged by layer one (the physical layer). (JA-444). This prior art process required much lengthier access probes (containing data) from the MS, and much more processing time if/when those access probes were received by the BS, thus prolonging the access procedure and causing unnecessary interference to the network and reducing its capacity. As a result, the prior art was sluggish and inefficient. (JA-1882 at 254:14-255:6).

Drs. Parsa and Kanterakis's invention increased the speed for establishing a connection with a BS and reduced unnecessary interference to the network. One innovative aspect of the invention was transmitting access preambles at increasing, discretely different power levels, and without message data. This significantly reduced the length of the signal and the time required to send an access request to the BS. Another innovative aspect was the use of a layer one

acknowledgement to acknowledge the detection of a preamble.  (JA-17, '267 patent at 7:58-66).

That is, when a preamble was detected, the BS would transmit a layer one acknowledgment (or

"L1 ACK") to indicate that the preamble was detected at a sufficiently high power level.  *Id*.

Because the L1 ACK is at a lower layer, the time required to transmit the signal is shorter than

with higher layer signals such as those used in the prior art.

In essence, the invention of the patents-in-suit allows for a much more efficient random

access procedure for establishing initial connection between the BS and the MS than what was

practiced in the prior art.  More specifically, the BS broadcasts a common channel which any MS

within range can detect.  (JA-1864, ¶ 57).  The broadcast common channel contains all of the

information that the MS needs to communicate appropriately with the BS (*e.g.*, the permissible

access preamble signatures that the MS can send to initiate the communication).  *Id.*  Based on

information received on the broadcast common channel, an MS will attempt communication with

a BS.  *Id*.

Each access preamble has one or more codes that distinguish one access preamble from

another during an access procedure.  The access preambles are transmitted at increasing,

discretely different power levels.  (JA-16, '267 patent at 5:59-6:10).  If no layer one

acknowledgement signal from a BS corresponding to an access preamble is detected by the MS

within a set time following transmission of a first access preamble, then the MS transmits a

spread access preamble from its transmitter at a second discrete power level higher than a first

discrete power level.  If a layer one acknowledgement corresponding to a transmitted access

preamble is detected, then the MS ceases preamble transmission and transmits packet data from

its transmitter.

D.    **The Prior Litigation in Texas, the Reexamination of the '267 Patent and the Issuance of the '427 Patent.**

Claims 13 and 23-29 of the '267 patent were the subject of prior litigation in the Eastern District of Texas, *Golden Bridge Technology, Inc. v. Nokia, Inc., et al.*, No. 2:05-cv-151 (together, with the subsequent appeal to the Federal Circuit, the "Texas litigation"). None of those claims are asserted in this case. All of the asserted claims of the '267 patent were introduced during the reexamination of that patent where the patentability of the claims was confirmed by the PTO. Similarly, the '427 patent issued just prior to the conclusion of the Texas litigation, and none of the claims of that patent were at issue in the Texas litigation.

## IV.    LEGAL STANDARDS

Claim construction is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Claim terms have the meaning that they would have to a person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). In construing the claims, they "'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

In addition to the specification, a court must consider the prosecution history of the patent before the PTO.

> Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent . . . . [T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.

*Phillips*, 415 F.3d at 1317.   Where the patent has undergone reexamination, a reexamination proceeding is part of the prosecution history, and also must be considered. *See On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1338-39 (Fed. Cir. 2006).

## V.   ARGUMENT

The parties have agreed on the construction of the terms "spreading an access preamble"/"spread access preamble," "spreading the selected preamble code," "spread spectrum" and "acknowledgment"/"acknowledgment signal."[2]   The claim terms requiring construction are set forth below on a limitation by limitation basis.   For the reasons stated below, GBT respectfully requests that the Court adopt GBT's proposed constructions.

### A.   Access Preamble/Preamble

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "access preamble" "preamble" | An access signal without message data and comprising one or more codes that distinguish one access preamble/preamble from another and used during an access procedure to facilitate establishing a communication link between a base station and a remote station. | A signal used for communicating with the base station that is spread before transmission. |

Defendants propose to construe this limitation in the same way it was construed in the Texas litigation.   (JA-1241-43).   But none of the asserted claims were at issue in the Texas litigation.   As indicated above, all of the asserted claims of the '267 patent were introduced in the reexamination of that patent, and were prosecuted and their patentability was confirmed after the

---

[2] Since filing the Joint Claim Construction Chart (D.I. 193), GBT has advised Apple that it is willing to stipulate to Defendants' proposed construction for "acknowledgement" / "acknowledgement signal" and therefore does not present argument regarding that previously disputed term herein.

conclusion of the Texas litigation. Similarly, the '427 patent issued just prior to the conclusion of the Texas litigation and was not at issue in the Texas litigation. Significantly, the prosecution history since the decision in the Texas litigation unambiguously establishes that the access preamble/preamble limitation must be construed to exclude message data, as proposed by GBT.

### 1.    The Prosecution History Disclaims Message Data from the Access Preamble/Preamble Limitation

During the reexamination of the '267 patent, GBT clearly and unmistakably limited the scope of the access preamble/preamble limitation to exclude message data. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be . . . ." *Phillips*, 415 F.3d at 1317. The doctrine of prosecution disclaimer precludes litigants "from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Co.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (citing, *inter alia*, *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21, 61 S.Ct. 235, 85 L.Ed. 132 (1940)). The classic scenario of prosecution disclaimer is one in which the patentee limits the scope of claims in order to distinguish prior art. *See, e.g.*, *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998) ("explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim"). Prosecution disclaimer applies when the patentee makes a "clear and unmistakable disavowal of scope during prosecution." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (internal punctuation and citation omitted).

During reexamination of the '267 patent, the PTO rejected the claims as unpatentable over the Hakkinen publication (JA-476-95, WO 97/46041) in view of the IS-95 Standard (JA-

422-63).  In order to overcome these rejections, GBT unambiguously disclaimed from the access

preamble/preamble limitation any message data:

> According to the IS-95 Standard, each access probe is a preamble plus a message. The definition of access probe (p. 1-1 of IS-95 Standard) is an "Access Channel transmission consisting of a preamble and a message."  In accordance with the subject matter of claims 24 and 25, the initial transmission is a preamble **without the message**.  In claims 24 and 26, the message only is sent in response to the acknowledgment."  [JA-781 (September 25, 2006 Amendment and Request for Reconsideration Under 35 C.F.R. § 1.111, p. 35) (emphasis added).]

* * *

> [W]hile IS-95 Standard does disclose in the paragraph bridging pages 6-106 and 6-107 that each successive access probe is sent at a higher power level than the previous access probe, the access probe is a preamble plus a message.  **It is not just a preamble alone**.  In accordance with the subject matter of claims 24 and 26, **the initial transmission is a preamble**.  **The message is sent after the acknowledgment is received**.  In claims 24 and 26, the message is not sent with the preamble, but in response to the acknowledgment.  [JA-781-782 (emphasis added).]

* * *

> As for the IS-95 Standard, as discussed *supra*, **the preamble of the present invention does not contain a message**.  The IS-95 Standard teaches sending the preamble and a message together and sending the acknowledgment to stop data transmission after receipt of a **preamble and message**.  [JA-784 (emphasis added and in original, respectively).]

The PTO then issued a rejection over Hakkinen in view of IS-95 and an Ericsson

publication.  (JA-969-1027).  In response, GBT filed an appeal to the PTO Board of Patent

Appeals and Interferences (JA-1148-1258) and, again, clearly and unambiguously disclaimed

from the access preamble/preamble limitation any message data:

> [A]t the time the **preambles** are transmitted from the mobile station, they **do not include the message or data**.  [JA-1160 (emphasis added).]

* * *

> In Appellant's system, **no message or data** is **sent with the preamble**.  [JA-1184 (emphasis added).]

11

* * *

> [A]ccording to the IS-95 Standard, each access probe is a **preamble plus a message**.  The definition of access probe (p. 1-1 of the IS-95 Standard) is an "Access Channel transmission consisting of a preamble and a message."  In accordance with the subject matter of claim 24, the initial transmission is a **preamble without the message**.  The message only is sent in response to the acknowledgment (the claim positively recites "upon receiving an acknowledgment at the RS-spread-spectrum receiver of the one remote stations, **ceasing preamble transmission and transmitting a** spread-spectrum **signal having data**").  [JA-1196 (emphasis in original).]

GBT limited the scope of access preamble/preamble in order to avoid prior art – specifically, Hakkinen and IS-95.  Because GBT clearly and unmistakably argued that the meaning of access preamble/preamble should be limited in order to avoid prior art, the doctrine of prosecution history disclaimer attaches. *See, e.g.*, *Omega Eng'g,* 334 F.3d at 1324 ("where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender").

### 2.   Apple's Expert Agrees that the Prosecution History Disclaims Message Data from the Access Preamble/Preamble Limitation

The disclaimer is viewed from the vantage of a person of ordinary skill in the art, and Apple's expert witness, Dr. Kakaes, agrees that such a person reading the prosecution history would understand the claimed access preamble/preamble to exclude message data. *See, e.g., Zircon Corp. v. Stanley Black & Decker, Inc*., 452 Fed. Appx. 966, 978 (Fed. Cir. 2011) (finding disclaimer where "[o]ne of ordinary skill in the art reading the file wrapper of this patent would believe that Zircon disavowed subtraction from the scope of its claims.").

In the '267 reexamination, the Appeal Brief states as follows:  "Third, at the time the preambles are transmitted from the mobile station, they do not include the message or data."

12

(JA-1160).  Dr. Kakaes testified that a person of ordinary skill in the art would understand this

passage to mean that the claimed preamble does not include message data:

> Q. Do you agree that a person of ordinary skill in the art would understand
> that the claim preambles do not include "message" or "data," as stated?
>
> A. Yes.
>
> [Objection and question read back to witness].
>
> THE WITNESS:  Yes.  I believe that the preambles – the applicants are
> saying the preambles are transmitted and they do not include the message or data.

(JA-1885 at 219:8-220).  Similarly, page 49 the same Appeal Brief states:  "In accordance with

the subject matter of claim 24, the initial transmission is a preamble without the message.  The

message only is sent in response to the acknowledgment...."  (JA-1196).  Dr. Kakaes testified

that a person of ordinary skill in the art would understand this passage also to mean that the

claimed preamble does not include message data:

> Q. And do you agree that a person of ordinary skill in the art reading that
> would understand that the claimed preamble does not include the message?
>
> A. . . . [I]t appears that the applicants are saying that in the claimed
> invention, the preamble does not include a message.
>
> And that's how I think a person of ordinary skill in the art would read this
> statement presented by the applicants.

(JA-1886 at 221:3-14).

The above-mentioned disclaimers were made in connection with, and apply to all

asserted claims of the '267 patent.  (JA-747-89; JA-1148-1258).  The '427 patent is a child of the

'267 patent, and therefore the disclaimers apply with equal force to the same limitation in the

claims of the '427 patent.  *See Omega Eng'g,* 334 F.3d at 1333 ("As long as the same claim

limitation is at issue, prosecution disclaimer made on the same limitation in an ancestor

application will attach.").  In addition, the parties agree that the access preamble/preamble

13

limitation is intended to have the same meaning in the asserted claims of both patents, and there is no indication in the intrinsic record to the contrary. *Southwall Techs, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995) ("[A]rguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary.").

### 3. GBT's Construction is Reinforced by the Language of the Claims and the Specification

All of the asserted claims recite transmitting access preambles at increasing, discretely different power levels if no layer one acknowledgment is received.  But when a layer one acknowledgement corresponding to a transmitted access preamble is detected, preamble transmissions cease and packet data is transmitted.[3]  Thus, the transmission of packet or message data does not begin until a layer one acknowledgment is received.  Apple admits this in its interrogatory response:  "The Asserted Claims require the transmission of preambles to cease *and the transmission of data to begin* upon receipt of an acknowledgement."  (JA-1873) (emphasis in original).

Each limitation must be construed in the context of the claims in which it is used, and the claim language necessarily requires that the access preamble/preamble be a signal without

---

[3] In the '267 patent, independent claims 42 and 44 recite "upon detecting a layer one acknowledgement corresponding to a transmitted access preamble, ceasing preamble transmission and transmitting packet data from the MS transmitter." (JA-15, '267 patent at 4:26-29, 56-59; and independent claims 50 and 58 recite "upon receiving an acknowledgement at the RS-spread-spectrum receiver . . . ceasing preamble transmission and transmitting a spread-spectrum signal having data from the RS spread-spectrum transmitter . . . " (JA-17-18, '267 patent at 7:16-19, 10:21-25).  In the '427 patent, independent claims 9 and 10 recite "upon detecting an acknowledgement comprising a signal corresponding to a transmitted access preamble, ceasing preamble transmission, and spread-spectrum transmitting the packet data from the remote station . . ." (JA-51, '427 patent at 12:29-33, 58-62); and independent claims 14 and 26 recite "upon receiving and detecting an [a first] acknowledgement signal corresponding to a transmitted access preamble, from the first base station, ceasing transmission of the access-burst transmission and transmitting a first spread-spectrum signal having data to the first base station." (JA-52, '427 patent at 14:48-52, 16:9-14).

message data.  *See Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270,

1275 (Fed. Cir. 2012) ("In *Phillips*, this court reinforced the importance of construing claim

terms in light of the surrounding claim language, such that words in a claim are not rendered

superfluous."); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("While

certain terms may be at the center of the claim construction debate, the context of the

surrounding words of the claim also must be considered in determining the ordinary and

customary meaning of those terms."); *see also Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d

1352, 1355 (Fed. Cir. 2004) ("As always, the claim language itself governs the meaning of the

claim. This court construes the meaning of claim language according to its usage and context.")

(citations omitted).

The specification of the patents-in-suit likewise is entirely consistent with GBT's

proposed construction.[4]  The specification makes clear that message data is not transmitted until

*after* a layer one acknowledgment is detected that corresponds to a transmitted access preamble.

Figure 6 illustrates the method by which an MS establishes a communication link with a BS.

The detailed description states in, pertinent part, as follows:

> The transmission of the preambles ceases if the preamble has been . . . detected by
> the base station and the base station has responded to the remote station with a
> layer one acknowledgment L1 ACK, which the remote station has also
> successfully received. * * * Upon receiving an L1 ACK the remote station starts
> transmission of its data.  [JA-17, '267 patent at 7:58-66.]

A person of ordinary skill in the art also would readily understand that the access

preamble is comprised of one or more codes, and the codes distinguish one access preamble from

another to facilitate establishing a communication link between a BS and MS.   During

---

[4] For ease of reference, GBT cites only to the specification of the '267 patent.  Because the '427
patent shares a common specification with the '267 patent, identical language is present in the
'427 patent, although it may appear at slightly different columns and line numbers.

prosecution of the '267 patent application, GBT argued to the PTO, in order to overcome a rejection based on the Ozluturk patent, as follows:  "Another disclosed distinction is that the access preamble here is itself a form of code data (e.g., a signature)...."  (JA-282, August 6, 2002 Office Action).  Thus, the prosecution history states that the access preamble is a form of code data, such as a signature.  Apple's expert witness agrees.  Dr. Kakaes testified that a person of ordinary skill in the art would understand from this passage that the access preamble is itself a form of code data, such as a signature, and when spread, it is spread in essentially the same manner as other data.  (JA-1884 at 129:7-131:6).

The patent specification further reinforces that a person of ordinary skill in the art would understand the preamble codes to distinguish one preamble from another to facilitate establishing a communication link between the MS and BS.  The specification states "[t]here are many ways of generating preamble waveforms."  (JA-17, '267 patent at 8:19-20).  But, "[t]he particular structure of the preamble waveforms is selected on the basis that detection of the preamble waveform at the base station is to be as easy as possible with minimal loss in detectability."  (JA-17, '267 patent at 7:19-23).  "There are many remote stations that might try to access the base station at the same time.  * * *  Each remote station chooses at random one of the preamble signals to use for accessing the base station."  (JA-18, '267 patent at 10:36-41).  The preamble codes "can be chosen so that identical codes are not used in the same locations for two different preambles."  (JA-17, '267 patent at 8:37-39).  Clearly, the preamble codes distinguish one preamble from another to, for example, avoid collisions, and facilitate establishing a communication link between the MS and BS.  GBT's expert witness, Dr. Vojcic, agrees: "GBT's proposed construction . . . is consistent with how a person of ordinary skill in the art would interpret "preamble" and "access preamble" particularly in light of the specification and

prosecution history…." (JA-1867, ¶ 73). See *AIA Eng'g Ltd. v. Maggoteaux Int'l S/A*, 657 F.3d 1264, 1273-1275 (Fed. Cir. 2011) (construing claim term by considering claims, specification, and prosecution history, as well as expert testimony regarding meaning of term to one skilled in the art). *See also Phillips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (internal quotation marks and citation omitted); *Kinetic Concepts, Inc. v. Blue Sky Med. Group*, 554 F.3d 1010, 1018-1019 (Fed. Cir. 2009) (construing claim language on basis of specification).

### 4. This Court is Not Bound by the Construction of Access Preamble/Preamble Stipulated Before the Texas Court

This Court is not bound by the stipulated construction of "preamble" from the Texas litigation, and should not apply that construction where, as here, it leads to clearly erroneous results. Claim construction is a question of law, and the court must determine the correct construction. *See Cross Atlantic Capital Partners, Inc. v. Facebook, Inc.*, No. 07-2768, 2011 WL 941870, at *9 (E.D. Pa. Mar. 17, 2011) (stipulated construction from earlier proceeding prior to reexamination of patent was not binding because "claims construction is a matter of law which the district court has an independent obligation to resolve."); *see also Ultradent Products v. Hayman*, No. 00-13402, 2002 WL 34477127, at *9 (C.D. Cal. Jan. 11, 2002) (court not bound by claim construction stipulation "because claim construction is exclusively a question of law"). Any construction of "preamble" that would include message data is plainly incorrect.

Notwithstanding the foregoing, Apple and the other Defendants may attempt to argue that GBT is estopped or precluded from asking the Court to construe one or more claim limitations in

a manner that departs from the prior claim construction ruling in the Eastern District of Texas, but that argument lacks merit.[5]

By way of background, in the prior litigation, GBT asserted only original claims 13 and 23 of the '267 patent against Lucent, and claims 23-29 against Nokia.  After the Eastern District of Texas granted summary judgment in favor of the defendants, GBT appealed to the Federal Circuit.  Thereafter, GBT settled with Nokia and the parties jointly sought dismissal of that aspect of the appeal (*i.e.,* claims 24-29).  GBT continued its appeal against Lucent, and ultimately, the Federal Circuit affirmed the Eastern District of Texas's summary judgment decision on May 21, 2008 without addressing claim construction.  *See generally Golden Bridge Tech., Inc. v. Nokia, Inc.*, 527 F.3d 1318 (Fed. Cir. 2008).

Neither the Eastern District of Texas nor the Federal Circuit considered, much less ruled upon, either the '427 patent (which issued on April 15, 2008) or the reexamined '267 patent (which issued on December 15, 2009), both of which are asserted in this case.  Further, none of the claims asserted in this case were asserted in the prior litigation, and the intrinsic record considered by the Eastern District of Texas and the Federal Circuit comprised only the original file history for the '267 patent – neither court had the benefit of considering the reexamination file history for the '267 patent, nor the file history for the '427 patent.

Against this backdrop, it is evident that collateral estoppel does not apply.  The first and most important prong of collateral estoppel is the requirement that the issue presented in the present case be "identical" to the issue presented in the previous case.  *See, e.g., Howard Hess Dental Labs. Inc. v. Dentsply Intern. Inc.,* 602 F.3d 237, 247 (3d Cir. 2010) (stating that the first

---

[5] GBT reserves the right to respond in its Reply Brief to any arguments raised by Defendants, but has tried to anticipate what Defendants may argue vis-à-vis the prior claim construction ruling to properly frame the issue for the Court.

element of collateral estoppel requires that "the *identical* issue was previously adjudicated") (emphasis added).[6]  The issues in the present case are far from identical to those presented in the prior case – the '427 patent is a different patent, the reexamined '267 patent has different claims from those asserted in the Texas litigation, and the reexamined '267 patent has additional prosecution history that is necessarily relevant to claim construction.[7]

This Court declined to apply collateral estoppel in similar (albeit less drastically changed) circumstances in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. 08-309, 2009 WL 4928029 (D. Del. Dec. 18, 2009), *adopted*, 2010 WL 2985537 (D. Del. July 20, 2010) (Farnan, J.).  In *Power Integrations*, then-Magistrate Judge Stark held that "significant developments" in the patent-in-suit's prosecution history precluded the application of collateral estoppel despite the fact that *both parties* were involved in a prior action in which the Court had construed the claims.  *See* 2009 WL 4928029 at *16 n.9 (citing and quoting *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 477 (3d Cir. 1997) ("When significant new facts arise out of a continuing course of conduct, the issues in a successive suit may fail to constitute the same 'issue' as to merit preclusive effect.")).  Notwithstanding the fact that there had been a prior claim construction, Judge Stark stated that "the [later-arising] reexamination history needs to be considered in connection with construing the claims."  *Id*. at *17; *see also generally Alexam, Inc. v. Best Buy Co., Inc.,* No. 2:10cv93, 2012 WL 1188406, at *7-8,  (E.D. Tex. Apr. 9, 2012) (noting that court had previously issued claim construction orders in five prior cases involving

---

[6] Regional circuit law applies to the determination of whether collateral estoppel is applicable. *See Applied Medical Resources Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1359-60 (Fed. Cir. 2008) (citation omitted) (affirming district court's decision not to apply collateral estoppel and noting that regional circuit law applies).
[7] To the extent Apple and the other Defendants argue that the other prongs of collateral estoppel are met, GBT will address those issues in its Reply Claim Construction Brief.

the suit patents and considering reexamination prosecution history in conjunction with analyzing claim construction for a sixth time).

Even outside of the context of reexamination proceedings, numerous courts have conducted subsequent claim construction proceedings and have not considered themselves bound by a prior claim construction determination, particularly where the prior constructions were not reviewed on appeal. *See, e.g., ICU Med., Inc. v. Rymed Techs., Inc.*, 364 Fed. Appx. 622, 2010 WL 375140, at *1 (Fed. Cir. 2010) (denying request for interlocutory appeal where the District of Delaware declined to apply claim construction ruling from prior district court action where prior constructions were not "expressly reviewed upon appeal"); *Graco Children's Prods., Inc. v. Regalo Int'l, LLC*, 77 F. Supp. 2d 660, 662-663 (E.D. Pa. 1999) (refusing to apply collateral estoppel to prior claim construction ruling where prior ruling had not been evaluated on appeal because the parties settled).

Accordingly, collateral estoppel is inapplicable in this instance. As noted above, the asserted claims of the '267 patent, which were added during reexamination, have a different prosecution history from those asserted in the Texas litigation. In the prosecution history for the asserted claims of the reexamined '267 patent, GBT repeatedly stated that the "preamble" limitation did not include message data.[8] Accordingly, the prosecution record for the asserted claims is different in this regard from the record relied upon in the Texas litigation, and authority from this Court confirms that GBT is not estoped from asking the Court to consider the additional prosecution history. *See Power Integrations,* 2009 WL 4928029, at *16-17.

---

[8] Indeed, the Texas district court emphasized the lack of such statements in the original prosecution history as a reason for interpreting "preamble" broadly to include other data. *See* JA-1284-86.

**5.    Defendants' Proposed Construction of Access Preamble/Preamble would Render the "Spreading" Limitation Superfluous, or Impermissibly Introduce a "Spreading" Step Where it does not Exist**

In the claims reciting "spreading an access preamble," Defendants' construction would render the claim limitation "spreading" superfluous, or introduce needless ambiguity, which is not permissible.[9]   *See Digital-Vending Servs. Int'l, LLC*, 672 F.3d at 1275 ("In *Phillips*, this court reinforced the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered superfluous.  For example, when a claim refers to 'steel baffles,' this 'strongly implies that the term "baffles" does not inherently mean objects made of steel.'") (citation omitted).   Under Defendants' proposed construction, the phrase "spreading an access preamble" in the claims would read "spreading [a signal used for communicating with the base station that is spread before transmission]."   Thus, the claims would either require that the signal be spread twice, which is not found in the specification or prosecution history, or it would at least be unclear whether the signal is spread more than once. Claim construction should elucidate the meaning of the claim terms, not introduce confusion or ambiguity.

Defendants' construction of "preamble" is also incorrect because it would impermissibly inject a "spreading" step that otherwise does not exist into claims 50 and 58 of the '267 patent and claims 9, 10 and 26 of the '427 patent.   Claims 50 and 58 of the '267 patent simply recite "transmitting [a/a first] preamble . . ." without a spreading step.   Similarly, claims 9, 10 and 26 of the '427 patent recite "transmitting an access-burst signal . . . comprising [a selected/an] access preamble . . ." without a spreading step.   Accordingly, Defendants' proposed construction would impermissibly inject into these claims a "spreading" limitation where it otherwise does not exist.

---

[9] The phrase "spreading an access preamble" appears in claims 27, 29, 42, and 44 of the '267 patent.  Asserted claims 51 and 52 depend from claims 27 and 29 respectively.

*MySpace Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1255 (Fed. Cir. 2012) (improper to read limitations from written description into claims absent clear intention by patentee to do so).

Regarding claims 14, 16, 18 and 20 of the '427 patent, Apple's proposed construction would violate two canons of claim construction. Claims 14 and 18 recite "transmitting a [first/second] access-burst signal . . . comprising an access preamble…." Apple's construction of "access preamble" improperly reads into these claims a limitation requiring spreading of the preamble prior to transmission and again violates the rule prohibiting reading limitations from the specification into the claims. *MySpace Inc.*, 672 F.3d at 1255. In addition, claims 16 and 20, which depend from claims 14 and 18, respectively, recite that the transmitting step comprises spreading the preamble code. Accordingly, because dependent claims 16 and 20 recite spreading the preamble code, Defendants' proposed construction of "preamble" to include "spreading" in claims 14 and 18 would violate the doctrine of claim differentiation. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest."). Accordingly, Apple's proposed construction of the access preamble/preamble limitation is erroneous for these additional reasons.

For all of the foregoing reasons, GBT respectfully requests that the Court adopt GBT's proposed construction of the access preamble/preamble limitation.

### B.   Packet Data

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "packet data" | Data organized into a packet. | Defendants submit that no construction is required. |

GBT's construction is consistent with the way the term is understood by those skilled in the art as evidenced by the definitions from technical dictionaries (JA-1844; JA-1840-41). *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1304 (Fed. Cir. 2007) (relying on technical dictionary to determine meaning of term to person skilled in the art); *Phillips*, 415 F.3d at 1318 (especially noting the helpfulness of technical dictionaries in construing claim language). The term "packet" is generally described in the definitions as a block of data to be transmitted, and the data contained in the packet would be referred to as packet data.

GBT's proposed construction was previously adopted in the Texas litigation. Unlike the term "preamble," there is nothing in the reexamination prosecution history that would warrant a different construction of "packet data." Indeed, Defendants do not propose a different construction, but merely state that no construction of the term is necessary.

GBT respectfully requests that the Court construe the term "packet data" consistent with the ordinary meaning of the words and the prior construction as "data organized into a packet."

## C. <u>Discrete Power Level</u>

| Claim Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "discrete power level" | Plaintiff submits no construction is required and this element can be interpreted in accordance with its plain and ordinary meaning. | A constant distinct power level. |

GBT maintains that the term "discrete power level" requires no construction, and that these words can be readily understood in accordance with their plain and ordinary meaning. The plain meaning of "discrete" is separate, distinct, or non-continuous. (JA-1829; JA-1833-34; JA-1837; JA-1898-1900 (dictionary definitions)). There is no need to apply a special definition to "discrete," or to replace the word "discrete" with a synonym such as "distinct." *See, e.g., U.S.*

*Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is required only to resolve "disputed meanings and technical scope" and "is not an obligatory exercise in redundancy"); *3M Innovative Props. Co. v. Louis M. Gerson Co., Inc.*, No. 08-4960, 2010 WL 4106712, at *6 (D. Minn. Oct. 12, 2010) ("court will not merely substitute synonyms for disputed language"); *Orion IP, LLC v. Staples, Inc*., 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005) ("[A]lthough every word used in a claim has a meaning, not every word requires a construction.").

### 1. <u>Defendants cannot Import the "Constant" Aspect of the Preferred Embodiment into the "Discrete Power Level" Limitation</u>

Defendants go well beyond the plain and ordinary meaning of "discrete power level" and seek a construction of the limitation as meaning "constant distinct power level." There is simply no justification for taking the word "discrete," which is readily understood by both persons of ordinary skill and laypersons alike, and changing it to "constant distinct," which has the effect of not just narrowing, but completely altering, what is claimed. While the power level of the preambles transmitted by the MS *may* be constant, there is nothing in the claims, specification or prosecution history that *requires* the preamble transmission to be at a "constant" power level. Throughout prosecution, GBT used the term "discrete power level" in accordance with the plain meaning of the words. Nowhere did GBT use the word "constant" in lieu of or to describe "discrete," much less clearly and unambiguously require that "discrete" mean a "constant distinct power level," or exclude from its coverage non-constant distinct power levels.

Indeed, Apple admits in its interrogatory response that GBT added the limitation "discrete power level" to overcome a rejection based on the Ozluturk patent, that Ozluturk used a continuous ramp-up in power, and that GBT argued the amended claims distinguish Ozluturk

because they require discretely different power levels rather than a continuous power level.

Apple stated in pertinent part as follows:

> According to GBT, amending its claims to "expressly require that the power levels of the preamble transmissions are discretely different" was needed to "more clearly point out certain distinctions over the art" in general and Ozluturk in particular. . . . GBT explained that the '267 patent, unlike Ozluturk, required "each preamble transmission [to be] at a discretely different power level. . . . Citing Fig. 6, GBT explained that "preamble transmissions [occurred] at discretely different power levels $P_0$ through $P_3$." GBT further noted that "Ozluturk uses a continuous ramp-up instead of discrete power levels."

(JA-1876).

Notably absent from the prosecution history cited by Apple is any reference to a "constant" power level. Rather, GBT pointed out that "discrete" (*i.e.*, non-continuous) preamble transmissions were different from the continuous preamble transmissions of Ozluturk. This distinction is further highlighted by another portion of the file history quoted in Apple's interrogatory response:

> 'As noted in the discussion of the rejections, the Ozluturk Patent only discloses continuous power ramp-up, during continuous preamble transmissions, until the mobile station receives an acknowledgement from the base station. It is submitted that the "discrete" power level language of amended claims 43 and 44 expressly excludes coverage of a system such as that of Ozluturk that uses a continuous power ramp-up. . . A continuous power ramp-up as in the Ozluturk patent does not provide two preamble transmissions at two different discrete power levels, where the second discrete power level is higher than the first discrete power level. . . This sequence of transmitting at a discrete power level, increasing to a new discrete power level and again transmitting is not found in or satisfied by a continuous power ramp-up, as in the Ozluturk patent. . . the continuous power ramp-up of Ozluturk does not meet the requirements for 'discrete' different power levels.'

(JA-1876-77).

These passages from the prosecution history cited by Apple make clear that GBT distinguished Ozluturk because the preamble transmission of Ozluturk is *continuous* and the claimed preamble transmissions are NOT continuous but rather are discretely different. Defendants are attempting to import a limitation from a preferred embodiment into the claim, a tactic which the Federal Circuit has precluded time and time again. *See, e.g., MySpace*, 672 F.3d at 1255 ("Limitations from parts of the written description, such as the details of the preferred embodiment, cannot be read into the claims absent a clear intention by the patentee to do so.").

> **2.     The Texas Court did not Construe "Discrete" to Mean "Constant Distinct" but rather Used the Plain and Ordinary Meaning**

Defendants may attempt to buttress their improper claim construction by relying on an exhibit that GBT submitted with its initial claim construction brief in the Texas litigation.  In that sole exhibit, GBT had preliminarily indicated that it agreed to Defendants' construction of "discrete power level" as "a constant distinct power level."  (JA-1888).  That interim agreement, however, was later retracted, as evidenced by GBT's later filed reply brief.  (JA-820-31).  In connection with the Reply Brief, GBT submitted an exhibit showing an updated list of the parties' stipulated constructions and the list did not include a stipulation concerning "discrete power level."  (JA-1897).

Moreover, the Texas court did not construe the term "discrete" in its claim construction Order (JA-1237-1254).  Rather, the Texas court construed other limitations containing the word "discrete", and in doing so, left the word "discrete" as is in its construction (*Id.*).  Thus, Defendants cannot credibly argue that their proposed construction was adopted in the Texas

litigation – though not express, the parties and the court in the Texas litigation utilized the word

"discrete" in accordance with its plain and ordinary meaning.[10]

Accordingly, GBT respectfully requests that the Court reject the construction proposed

by Defendants and apply the plain and ordinary meaning of the "discrete power level" limitation.

### D. "If no [acknowledgement/layer one acknowledgement] corresponding to the access preamble is detected, transmitting . . ." and "transmitting a spread access preamble . . . if no layer one acknowledgement corresponding to any of the preamble transmissions is received"

| Claim Terms | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| [i] "If no [acknowledgment / layer one acknowledgement] corresponding to the access preamble is detected, transmitting a spread access preamble from the MS transmitter at a second discrete power level higher than the first discrete power level" | If no [acknowledgement/layer one acknowledgement] signal from a base station corresponding to the access preamble is detected by the MS within a set time following transmission of the first access preamble, then transmitting a spread access preamble from the MS transmitter at a second discrete power level that is higher than the first discrete power level. (Emphasis added). | Defendants submit that no construction is required. |

---

[10] GBT's submission of the litigation materials to the PTO in an Information Disclosure Statement does not transform the exhibit in its Initial Claim Construction Brief into an admission. First, as is clear from the Texas district court's claim construction order, the parties and the court ultimately determined that the term "discrete" should be interpreted based upon its plain and ordinary meaning. Moreover, GBT did not argue for a special construction of "discrete" either in the IDS or during prosecution of the reexamination. Merely listing the claim construction brief in the IDS, without more, is not an admission of anything by GBT. *See Abbott Labs. v. Baxter Pharm. Prods., Inc.*, 334 F.3d 1274, 1279 (Fed. Cir. 2003) ("[W]ith the mere listing of references in an IDS, the applicant has admitted no more than that the references in the disclosure may be material to prosecution of the pending claims.").

| Claim Terms | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| [ii] "transmitting a spread access preamble at a successively higher power if no layer one acknowledgement corresponding to any of the preamble transmissions is received" | Transmitting a spread access preamble at a successively higher power if no layer one acknowledgement corresponding to any of the preamble transmissions is received <u>from a base station within a set time following transmission of an access preamble</u>. (Emphasis added). | Defendants submit that no construction is required. |

GBT submits that these limitations are properly construed to include the underlined language indicated above.

GBT's construction of limitation [i] to include a "set time" between preamble transmissions is dictated by the prosecution history.  In order to overcome a rejection based on prior art, GBT argued during prosecution of the '267 patent application that this limitation means "the mobile station **transmits** a **preamble at selected spacing/intervals**, with each successive transmission stepped to a higher transmit-power level, and it ceases preamble transmission in order to send data upon receipt of a corresponding acknowledgement." (JA-223 (emphasis added)).  *See also* JA-226 ("If NO acknowledgement corresponding to the first preamble is detected, **then** the mobile station or handset transmits a second preamble . . .") (emphasis added).

Then, in order to overcome a rejection based on Hakkinen and IS-95 during the '267 reexamination, GBT argued, again, that limitation [i] means "[t]he remote station **transmits** the preamble **and then listens** for an acknowledgement.  If the remote station does not detect an acknowledgment, it re-transmits the preamble at a higher power level.  In other words, it is the silence or absence of an acknowledgement from the base station that causes the remote station to re-transmit the preamble." (JA-783 (emphasis added)).  In the subsequent Appeal Brief, in order

28

to overcome the Hakkinen and IS-95 rejection, GBT reiterated the same argument.  (JA-1201).

*See, e.g.*, *Computer Docking Station Corp. v. Dell Inc.*, 519 F.3d 1366, 1375-1379 (finding

disclaimer based on "sum of the patentees' statements during prosecution").

Accordingly, GBT clearly and unambiguously limited the scope of limitation [i] to

require a "set time" between preamble transmissions.   Moreover, Apple admits in its

interrogatory response that the prosecution history dictates this construction.  Apple states, in

pertinent part, as follows:  "GBT further stated, . . . 'if no acknowledgement is received from the

base station to the preamble, the remote station sua sponte ramps up its power and sends a

second preamble at a higher power level.'  [9/25/06 Amend.] at 31, 33; *see also id.* at 37 ('In

other words, **it is the silence or absence of an acknowledgement** from the base station **that**

**causes the remote station to re-transmit the preamble**.').  The **prosecution history** for the

'267 patent, both reexaminations of the '267 patent, and the '427 patent **contain numerous,**

**similar representations**."  (JA-1874, p. 23, emphasis added).

This construction is reinforced by the language of the claims and the patent specification.

First, the language of the claims is clear that the step of "transmitting a spread access preamble

from the MS transmitter at a second discrete power level" occurs only "if no layer one

acknowledgement corresponding to the [prior] access preamble is detected[.]"  (JA-27, '267

patent at 4:20-26).  Thus, the claim language necessarily requires a set time between preamble

transmissions during which the MS may detect a layer one acknowledgement.  Then, if a layer

one acknowledgement is not detected during the set time, another preamble is transmitted at a

higher discrete power level.

Second, the specification is clear that there is a set time between preamble transmissions,

and that if no acknowledgement signal is received from the BS during that set time, a second (or

subsequent) preamble is transmitted at a higher discrete power level.  Figure 6 of the '267 patent

shows a time period between each successive preamble transmission $P_0$ through $P_3$.  Referring to

Fig. 6, the specification describes this process as follows:

> For the duration $T_D$ between preambles the access burst consists of
> a pilot signal transmitted at a fixed power level ratio relative to the
> previously transmitted preamble. . . . The pilot signal could be
> eliminated by setting it to a zero power level.

(JA-17, '267 patent at 7:51-57).

Limitation [ii] above appears only in claim 43 of the '267 patent, which depends from

independent claim 42 including limitation [i] above.  In claim 43, limitation [ii] simply requires

that the method comprise "one or more additional steps" of limitation [i] "up to a maximum

allowed number of preamble transmissions."  (JA-27, '267 patent at 4:30-35).  Claim 43

therefore requires that limitation [i] of claim 42 be repeated one or more additional times, but

otherwise does not change the construction of that limitation.

It is therefore respectfully submitted that limitations [i] and [ii] be construed to require a

set time between successive preamble transmissions.

## VI.    CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court adopt GBT's

proposed constructions of the disputed claim terms as set forth herein.

Dated:  October 24, 2012
Public Version Filed:  October 26, 2012

McCARTER & ENGLISH, LLP

/s/ Daniel M. Silver
Michael P. Kelly (# 2295)
Daniel M. Silver (# 4758)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
*mkelly@mccarter.com*
*dsilver@mccarter.com*

Mark D. Giarratana
Eric E. Grondahl
CityPlace I
185 Asylum Street
Hartford, CT 06103
(860) 275-6700
*mgiarratana@mccarter.com*
*egrondahl@mccarter.com*

*Attorneys for Golden Bridge Technology, Inc.*

KLEHR HARRISON HARVEY
BRANZBURG LLP

/s/ Sean M. Brennecke
David S. Eagle (#3387)
Sean M. Brennecke (#4686)
919 Market Street, St. 1000
Wilmington, DE  19801
(302) 552-5518
*deagle@klehr.com*
*sbrennecke@klehr.com*

*Attorneys for Golden Bridge Technology, Inc. with
respect to claims asserted against Amazon.com,
Inc., Hewlett-Packard Company and Palm, Inc.*