IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GOLDEN BRIDGE TECHNOLOGY, INC., | ) | |
| | ) | C.A. No.  10-428-SLR-MPT |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| APPLE INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF APPLE'S MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY OF ALL ASSERTED CLAIMS**

OF COUNSEL:

Timothy S. Teter
Lowell Mead
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Tel: (650) 843-5000

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza 6th Floor
1313 N. Market Street
Wilmington, DE  19899
Tel:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant Apple Inc.*

Dated:  January 11, 2013
Public Version Dated: January 18, 2013
1089684 / 35716

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. ARGUMENT ....................................................................................................... 2

    A.  GBT DOES NOT HAVE INDEPENDENT OR CORROBORATED EVIDENCE OF PRIOR
        CONCEPTION. ................................................................................................. 2

        1.  GBT admits that the Kanterakis drawings were "necessary information"
            that did not exist until February 23, 1999. ............................................... 2

        2.  The inadmissible Parsa notebook, which GBT concedes is *not*
            corroboration, is a red herring. ............................................................... 4

            a.  GBT concedes that the undated sketches are *not* corroboration
                and cannot authenticate their dates. .................................................. 4

            b.  A sketch of the IS-95 prior art is not evidence of conception. ........... 6

            c.  As GBT's witnesses admit, the undated sketch of unlabeled
                boxes does not show the invention. ................................................... 7

        3.  Parsa's TR46.1 submissions, which describe only vague functional goals,
            neither show nor corroborate conception. ............................................. 10

            a.  Parsa's attempt to maintain "flexibility" because he didn't
                want to "upset anybody" is not corroboration. ................................. 10

             b.  "TBD" is not a clear or enabling disclosure, and as Kanterakis
                 testified, GBT's attempt to "fill in the gaps" "was not correct." ....... 12

            c.  GBT's post-critical date TR46.1 submissions are legally
                 irrelevant and support Apple's motion in any event. ........................ 14

        4.  ███████████████████████████████ .................. 15

        5.  Vojcic's conclusory opinion cannot overcome GBT's many admissions or
            defeat summary judgment. ................................................................... 15

    B.  GBT WAS NOT DILIGENT FOR THE ENTIRE CRITICAL PERIOD ............................ 16

        1.  GBT concedes that the inventors put the patent "at the bottom" of their
            priorities list for *over four months*. ...................................................... 16

        2.  GBT's new "engineering diligence" theory is mere lawyer argument that
            GBT's witnesses conclusively refute. .................................................... 17

        3.  GBT's new "attorney diligence" evidence is inadmissible and cannot
            defeat summary judgment. ................................................................... 19

III. CONCLUSION ................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brigham and Women's Hosp. Inc. v. Teva Pharma. USA,*
    707 F. Supp. 2d 463 (D. Del. 2010) ..................................................................20

*Brown v. Barbacid,*
    276 F.3d 1327 (Fed. Cir. 2002)...........................................................................6

*Cordance Corp. v. Amazon.com, Inc.,*
    639 F. Supp. 2d 406 (D. Del. 2009) .....................................................................6

*In re Echostar Comm'n Corp.,*
    448 F.3d 1294 (Fed. Cir. 2006)..........................................................................20

*Griffith v. Kanamaru,*
    816 F.2d 624 (Fed. Cir. 1987)...........................................................................17

*In re Japanese Elec. Prods. Antitrust Litig.,*
    723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds,* 475 U.S. 547 (1986).............................5

*Katz v. AT&T Corp.,*
    191 F.R.D. 433 (E.D. Pa. 2000)........................................................................20

*Keizer v. Bradley,*
    270 F.2d 396 (CCPA 1959) ............................................................................18

*Kenexa Brassring Inc. v. Taleo Corp.,*
    751 F. Supp. 2d 735 (D. Del. 2010) ..............................................................passim

*Kridl v. McCormick,*
    105 F.3d 1446 (Fed. Cir. 1997)..................................................... 3, 11, 13, 16

*Lockwood v. American Airlines, Inc.,*
    107 F.3d 1565 (Fed. Cir. 1997)..........................................................................16

*Northpoint Tech. v. The DirectTV Group,*
    09-CV-506-JRN, slip op (W.D. Tex. June 17, 2011), *aff'd* No. 2011-1524 (Fed. Cir. May 11, 2012)...........................................................................13

*In re NTP, Inc.,*
    654 F.3d 1279 (Fed. Cir. 2011)..........................................................................14

**TABLE OF AUTHORITIES**
(cont'd)

**Page(s)**

*Pineda v. Ford Motor Co.,*
520 F.3d 237 (3d Cir. 2008) ..................................................................................10

*S.O.I.TEC Silcon on Insulator Techs. v. MEMC Elec. Materials, Inc.,*
C.A. No. 05-806-GMS, slip op. (D. Del. Mar. 13, 2008)....................................20

*Telemac Cellular Corp. v. Topp Telecom, Inc.,*
247 F.3d 1316 (Fed. Cir. 2001)..............................................................................16

*Watkins v. Wakefield,*
443 F.2d 1207 (CCPA 1971) ..................................................................................18

**STATUTES**

35 U.S.C. §102(e) ........................................................................................................15

**OTHER AUTHORITIES**

FED. R. EVID. 901........................................................................................................5

## I.   INTRODUCTION

GBT and its witnesses admit the material facts, leaving nothing for trial on invalidity. GBT admits that if the Ericsson patent is prior art, the patents-in-suit are invalid.  GBT admits that its primary inventor, Kanterakis, did not have the first draft of his drawings until February 23, 1999—*four-and-a-half months* after Ericsson filed its application.  GBT further admits that Kanterakis' drawings were "necessary information" and "needed" for a PhD and former Professor of Electrical Engineering to reduce the invention to practice.  Because the Kanterakis drawings are the earliest evidence that shows a definite and permanent idea of the complete and operative invention, the invalidity dispute should be over.  The patents-in-suit are invalid.

GBT's opposition raises several smokescreens, but no genuine issue of material fact. First, GBT cites two undated and inadmissible sketches from the notebook of co-inventor Parsa. But GBT admits that the notebook is not independent evidence, and concedes that it cannot be used as corroborating evidence. ███████████████████████

████████████████████████████████

████████████████████████████████

████████████

Second, GBT cites its submissions to the TR46.1 standards group.  ████████

█████████████████████████████████

███████████████████████████████

█████████████████████████ As GBT's expert conceded, the TR46.1 standards group focused on the air interface and compatibility, not on enabling product designs.  Parsa's TR46.1 submissions were so murky and incomplete that the primary inventor, Kanterakis, could not even tell what the TR46.1 submissions were attempting to convey.  After studying the submissions, Kanterakis ultimately concluded that GBT's

interpretation, which "fills in the gaps" is *"not correct."* GBT attempts to excuse Parsa's omissions by contending that Parsa was merely allowing for "flexibility" and "keeping it open," in an effort to avoid offending the other TR46.1 participants. The law requires independent evidence that the inventors conceived of the complete and operative invention, not excuses for the lack of such evidence.

Third, GBT raises a new diligence theory. Although GBT concedes that the invention was at the bottom of the inventors' priorities list, GBT argues that work on *any* aspect of the WCDMA standard was necessary to practice the invention, and thus, counts as "engineering diligence." GBT offers no evidence in support of its new argument, which GBT's own witnesses refute. In fact, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████

## II.   ARGUMENT

### A.   GBT does not have independent or corroborated evidence of prior conception.

#### 1.   GBT admits that the Kanterakis drawings were "necessary information" that did not exist until February 23, 1999.

GBT erroneously argues that "only two limitations" are in dispute. (D.I. 239 at 1.)  To the contrary, GBT does not have evidence of prior conception of *"the complete and operative invention"* including *every limitation.* (D.I. 219 at 17.)  The first evidence that GBT possessed a definite and permanent idea of the complete and operative invention is the March 22, 1999 patent application, which includes Kanterakis' drawings of the mobile, base station, and preamble structure and waveforms.  Kanterakis did not remember when he first had a definite and permanent idea of the invention in his drawings, (D.I. 219 at 19-21), and GBT did not produce or log Kanterakis' drafts.  Nevertheless, GBT now concedes that Kanterakis wrote "the *initial draft*

of the drawings for the '267 application" on February 23, 1999, four-and-a-half months *after* Ericsson filed the Dalhman application. (D.I. 239 at 39 (emphasis added).) GBT further concedes that Dr. David Newman, an engineering professor, consultant, and lawyer who drafted and prosecuted applications for GBT, "*needed the drawings to prepare the patent application,* because, as is evident from a review of the '267 patent, the specification is largely directed to a detailed description of the drawings." (D.I. 239 at 39 (emphasis added).) GBT states that the Kanterakis drawings were "*the necessary information* required to draft the bulk of the '267 patent application." (D.I. 239 at 39-40 (emphasis added).)

Because that admittedly "necessary information" does not appear in any GBT document or other evidence dated earlier than October 5, 1998, GBT cannot defeat summary judgment. GBT's earliest conception date is *February 23, 1999*, which is the earliest possible date "proved by corroborating evidence which shows that the inventor disclosed to others his complete thought expressed in such clear terms as *to enable those skilled in the art to make the invention.*" *Kridl v. McCormick*, 105 F.3d 1446, 1449-50 (Fed. Cir. 1997) (emphasis added); *Kenexa Brassring Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 753 (D. Del. 2010) (holding that conception "is complete only when the idea is so clearly defined in the inventor's mind that *only ordinary skill would be necessary to reduce the invention to practice*, without extensive research or experimentation") (emphasis added).

There is no dispute that the Kanterakis drawings were needed for a person of ordinary skill in the art to reduce the invention to practice. Although Dr. Newman was also an attorney, he had far *more* than the level of ordinary skill proposed by either side. (PA25 ¶31.) Dr. Newman had a PhD in Electrical Engineering, and Kanterakis testified that Dr. Newman was "very well versed in CDMA and related technologies." (PA273, Kanterakis Tr. 102:13-21.)

3

Before Dr. Newman worked on the patents-in-suit, he was a Professor of Electrical Engineering at George Washington for nearly a decade, where he taught electrical engineering, specializing in communications and telecommunications. (DSSA Ex. 1 (Newman Tr.) 13:22-14:25.)[1] If the drawings were "needed" and "necessary" for a person of extraordinary skill such as Dr. Newman, then they would have been necessary for a person of ordinary skill in the field to make the invention.[2] As a result, GBT's earliest possible date is February 23, 1999, and therefore, summary judgment is required.

 2. **The inadmissible Parsa notebook, which GBT concedes is _not_ corroboration, is a red herring.**

  a. **GBT concedes that the undated sketches are _not_ corroboration and cannot authenticate their dates.**

GBT dwells on two undated sketches on the backside of two pages in Parsa's scattered ▓▓▓▓▓ notebook. (D.I. 239 at 3-6, 22, 27-28.) GBT does not attempt to offer the entire notebook into evidence, and concedes that the undated, unwitnessed, and unsigned sketches "may not be independent (i.e. corroborating) evidence," but argues that the Court should consider them anyway. (D.I. 239 at 27 (emphasis added).)

As GBT admits, the two sketches are _not_ independent evidence, and thus, cannot satisfy the corroboration requirement or create a genuine issue for trial. Nonetheless, GBT equates the two undated sketches to the evidence the Court addressed in _Kenexa Brassring_. (D.I. 239 at 27.) GBT mischaracterizes _Kenexa Brassring_, in which the Court considered source code—which

---

[1] Newman worked on CDMA patents and opinions for various companies, including Interdigital. (_Id._ 28:1-29:6.) "DSSA" is Defendant's Second Supplemental Appendix, filed herewith.

[2] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ GBT's diligence expert, Mr. Garner, emphasized that the application and Kanterakis drawings were complex, even for a PhD and former Electrical Engineering Professor. (PA853 n.22 ("these are complex technologies, complex patent applications") (quoting DSSA Ex. 1 (Newman Tr.) 59:13-25, 60:22-61:2 and 62:5-11).)

had timestamps and was authenticated by its author—yet still *rejected* the attempt to establish a prior conception date. *Kenexa Brassring*, 751 F. Supp. 2d at 760.

Here, the two undated sketches, which GBT submits with an incomplete sampling of other pages, are not admissible at all. Unlike the time-stamped source code in *Kenexa Brassring*, the sketches are undated, not authenticated, and part of an improperly maintained notebook (with no chain of custody and with missing and torn out pages). GBT contends that Parsa "authenticated" the notebook, but points only to Parsa's testimony that the notebook was his at one time, and contained some of his handwriting. (D.I. 239 at 29.) ███████████████

██████████████████████████████████████████████████████████
██████████████████████████████████

GBT provides no foundation whatsoever that the two undated sketches, both of which appear on the back side of pages, were made prior to the critical date, October 5, 1998. *See* FED. R. EVID. 901 ("[T]he proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). ████████████████████████

██████████████████████████████████████████████████████████
████████████████████████████████████████████

Although Parsa allegedly wrote the sketches, GBT's lawyers argued that it would be "speculation" for Parsa to identify them, (DSSA Ex. 2 (Parsa Tr.) 354:17-24), ████████████
███████████████████████████████████████

GBT argues that the notebook contains a few *other* dated pages (including pages dated *after* the critical date), but those other dates cannot authenticate the sketches. (D.I. 239 at 28.) Because the notebook is not a self-authenticating document, GBT must authenticate the sketches using evidence that itself is admissible, a burden that GBT does not carry. *In re Japanese Elec.*

*Prods. Antitrust Litig.*, 723 F.2d 238, 285 (3d Cir. 1983), *rev'd on other grounds*, 475 U.S. 547 (1986).[3]

Nonetheless, GBT argues that the undated sketches are admissible under *Cordance* and *Brown v. Barbacid*. (D.I. 239 at 28 (citing *Cordance Corp. v. Amazon.com, Inc.*, 639 F. Supp. 2d 406, 433-434 (D. Del. 2009) and *Brown v. Barbacid*, 276 F.3d 1327 (Fed. Cir. 2002).) Neither case supports GBT's argument. *Cordance* addressed authentication of a copy of computer *web pages*, not undated sketches in a compromised notebook, and the author of the web pages submitted a declaration explaining the allegedly missing web pages and blanks on other web pages. *Cordance*, 639 F. Supp. 2d at 433 (noting that the blanks and alleged missing pages were "explained in the declarations"). Similarly, the inventor in *Brown v. Barbacid* provided a declaration specifically addressing and authenticating the lab notebook pages at issue, and specifically stating that the inventor conducted an assay on that date. *Brown*, 276 F.3d at 1333-1334 ("On September 25, 1989, I conducted an assay…."). In contrast to the patentees in *Brown* and *Cordance*, GBT does not offer *any* admissible evidence to authenticate the sketches and establish that they were drafted prior to the critical date. The sketches are inadmissible.

### b.    A sketch of the IS-95 prior art is not evidence of conception.

Even if the undated sketches were admissible, they fail to show the conception, much less the "necessary information" in the Kanterakis drawings. (D.I. 239 at 39-40; *see also* DA Ex. 28 at § X.C.) GBT argues that a small sketch on the backside of an undated page, which GBT refers to as "FIG. A," shows conception. (D.I. 239 at 4, FIG. A.) ███████████████████████

---

[3] The dates on pages that GBT does not submit in evidence show that Parsa was still jotting notes in the notebook *after* the critical October 5, 1998 date, including "Nov. 18, 98" and "Jan. 10, 99." (DSSA Ex. 4 at GOLD 12148-49.)



GBT's expert, Vojcic agreed with Parsa

that "there's nothing new" in the sketch.  (PA174, Vojcic Tr. 263:6-264:15.)  An undated sketch

of the IS-95 prior art is *not* evidence of conception.

**c.     As GBT's witnesses admit, the undated sketch of unlabeled
boxes does not show the invention.**

GBT also argues that undated and unwitnessed "FIG. B and FIG. C" in Parsa's notebook

"further establish[es] conception of the invention."  (D.I. 239 at 6-8.)  However, GBT's

witnesses concede that the undated figures do not show the claimed invention.  The top half of

the undated sketch (which GBT labels "FIG. B") shows only that signal strength decreases with

range.  The bottom half of the undated sketch (which GBT labels "FIG. C") provides only

"scarce information" and unmarked, unlabeled boxes, not a description of the invention.   Unlike

the Kanterakis drawings, FIG. C does not provide any schematic at all, much less a design for a

base station and mobile to practice the invention.  In addition, FIG. C does not even provide a

high-level functional description of the invention.  First, FIG. C shows at most only the reception

of a single signal at the base station, represented by an unlabeled box, and the reception of an

7

acknowledgement at the mobiles.  (DSSA Ex. 5 (Vojcic Tr.) 229:25-230:4.)  The invention

requires the *transmission* of *multiple* preambles.

Second, FIG. C does not show that a preamble—a fundamental prerequisite of the

invention—is sent or received.  Instead, FIG. C purportedly shows the base station receives an

*unlabeled box*.  The page does not include any annotations or text describing what that unlabeled

box represents.  GBT argues that the base station's response to the unlabeled box – an "L1 ACK"

– indicates that the base station is acknowledging a preamble.  (D.I. 239 at 7, 9.)  However, Dr.

Vojcic conceded that a layer 1 acknowledgement could be used to acknowledge *any* physical

layer signal, and the FIG. C sketch does *not* say what type of signal is being acknowledged:

> Q  A layer 1 acknowledgement can be used to acknowledge any physical
> layer signal, correct?
>
> A  That's correct.
>
> Q  It doesn't have to be a preamble, correct?
>
> A  Layer 1 acknowledgement has to be acknowledgement to some
> physical layer signal.  That's correct.
>
> Q  ***And there's nothing on page 7742 that indicates what physical
> layer signal the L1 ACK is acknowledging, correct***?
>
> A  ***On that page, no, it doesn't*****.....**

(DSSA Ex. 5 (Vojcic Tr.) 254:9-19 (emphasis added).)

Third, even if the unlabeled box in the undated sketch is deemed to be a preamble, Vojcic

admitted that the sketch does not show power ramping from one preamble to the next:

> Q  Would you agree that power ramping is not shown on page GBT
> 7742?
>
> A  ***On this page power ramping is not shown***, because it shows just one
> instance of the preamble.

(DSSA Ex. 5 (Vojcic Tr.) 242:10-13 (emphasis added).)  GBT nonetheless argues that a person

of ordinary skill would understand that an unlabeled box means that multiple preambles should

be sent, each at a discrete power level different from the previous preamble, with listening

periods in between.  (D.I. 239 at 8.)  In essence, GBT is saying that an unlabeled box is enough

to convey the invention.  However, Vojcic admitted that the unlabeled boxes that showing

reception at the base station "could be almost" anything.

| PA170, Vojcic Tr. 224:5-16 (emphasis added) | DSSA Ex. 6 (DX 813) – Square Symbol from Notebook (FIG. C background added) |
| --- | --- |
| Q    Does the symbol in 813 -- and you want to look at it in landscape so that that line is at the bottom.  Does that symbol by itself have any meaning to a person of ordinary skill in the art?<br><br>A    It all depended -- depends on which context he would look at that thing.<br><br>Q    So we need context to determine what this box that we marked as 813 is; is that correct?<br><br>A    Yes, that's correct.<br><br>Q    So *it could be almost anything*; you need to context to figure out what?<br><br>A    *I agree, you need the context.* |  |

Fourth, the invention requires CDMA, yet Vojcic conceded that the undated sketch does

not identify whether the figure is associated with CDMA, TDMA, OFDM, or FDMA.  (DSSA

Ex. 5 (Vojcic Tr.) 253:20-23 ("Q   There's nothing on 7742 that indicates whether this figure is

associated with CDMA, TDMA, OFDM, or FDMA, correct?  A  Yes.  In that figure alone it

doesn't.").)

FIG. C is an unannotated, unexplained, undated hand-drawn sketch of an unlabeled box

received by the base station.  Thus, FIG. C falls far short of providing even a high-level

functional description of the invention.  GBT and Vojcic argue that the undated sketch of the IS-

95 prior art (FIG. A) should be combined with the undated sketch of the unlabeled boxes (FIG.

C) that appears many pages later, and that the combination suggests that Parsa might have been

thinking of the invention.  (D.I. 239 at 8.)  ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ Nothing in the notebook connects the two sketches in

any way, and no witness analyzed the sketches in the context of the entire notebook.  GBT never

accounted for the missing pages, and Vojcic did not study the entire notebook to see whether the

two sketches should be combined.  (DSSA Ex. 5 (Vojcic Tr.) 251:24-252:3.)  In fact, Vojcic

knew so little about the notebook that GBT moved to strike responses to questions about

anything other than the two sketches, protesting that "this is all outside the scope of his expert

opinion."  (DSSA Ex. 5 (Vojcic Tr.) 251:1-3.)  Vojcic's unsupported attempt to combine the

sketches, based on his admittedly incomplete analysis of the notebook, is irrelevant, unreliable,

and inadmissible.  *See Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008).

> **3.  Parsa's TR46.1 submissions, which describe only vague functional goals, neither show nor corroborate conception.**
>
> **a.  Parsa's attempt to maintain "flexibility"** ██████████████ **██████████████ is not corroboration.**

GBT argues that the TR46.1 submissions corroborate the inventors' testimony, and even

if they do not, are independent evidence of conception.  (D.I. 239 at 9-14.)  Neither is the case.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ In any event, the TR46.1

submissions provide only high-level functional proposals for an air interface, not evidence of

conception.  Unlike the Kanterakis drawings, the TR46.1 submissions do not contain any circuit

or device schematics, and do not show a complete and operative idea of the claimed invention or

enable any base station or mobile station design.  (DA Ex. 20, Vojcic Tr. 373:18-374:6; *see also*

DA Ex. 28 at § X.D.)  To the contrary, GBT admits that it did not have that "necessary

information" until it possessed the Kanterakis drawings in February 1999.  (D.I. 239 at 40.)

Even as high-level functional descriptions, Parsa's TR46.1 submissions are lacking.  The submissions are fundamentally different from the claimed invention, and Apple's opening brief identified numerous key claim limitations that the submissions do *not* include.  (D.I. 219 at 13 (Tables 1 and 2).)  GBT and Vojcic do not identify *anything* in the TR46.1 submissions that shows these features, including (1) the transmission of multiple preambles, (2) each at a discrete power level, with (3) a wait/listening period in between.[4]  Instead, GBT attempts to excuse the omissions, arguing that Parsa sought to leave room for "extra flexibility for engineering tradeoffs" and "fine tuning."  (D.I. 239 at 10.)  GBT argues that a person of ordinary skill would have "readily understood" that they could pursue various *different* approaches, only one of which would (allegedly) be the claimed invention.  (D.I. 239 at 11-12.)  However, the law requires GBT to present corroborating evidence showing that the inventors possessed the complete and operative invention and disclosed it to others in such clear terms as to enable it.  *Kridl*, 105 F.3d at 1449-50.  Conclusory expert testimony does not suffice.

GBT argues that Parsa was merely following "good engineering" by allowing for "engineering flexibility."  (D.I. 239 at 12.)  GBT argues that ██████████████████ ████████████████████████████████████████████  Even if that was Parsa's motive—which makes little sense—████████████████████  is not a legally-recognized excuse for an absence of corroborating evidence.  Similarly, an alleged desire to maintain "engineering flexibility" is not an excuse for omitting limitations entirely.  As this Court noted in *Kenexa Brassring*, "*every limitation* must be *shown* to have been known to the

---

[4] The features that are missing from GBT's documents were the very reason the PTO granted the claims—in other words, if GBT's TR46.1 documents describe anything, they show the prior art Ozluturk method that GBT distinguished during prosecution.  (D.I. 219 at 14.)

inventor at the time the invention is alleged to have been conceived." *Kenexa Brassring*, 751 F.

Supp. 2d at 753 (emphasis added).

     **b.**    **"TBD" is not a clear or enabling disclosure, and as Kanterakis testified, GBT's attempt to "fill in the gaps" "was not correct."**



    GBT attempts to shoe-horn the invention into the phrase "TBD" or "to be determined."

(D.I. 239 at 10-11.)  As GBT notes, the TR46.1 submissions state that power steps ("deltas") are

"TBD."  GBT argues that *if* a person of ordinary skill in the art:  (1) decided to violate Parsa's

proposal to ramp-up the power quickly, eliminating all of the "TBD" delta values, (2) decided

that the mobile should send multiple preambles (rather than the single preamble shown), ***and***

(3) decided that the mobile should wait between each preamble transmission—then that person of skill in the art would think of the invention, at least at a functional level. (D.I. 239 at 10-11.)

"To be determined" or "TBD" is not even a clear functional description, much less an enabling description, and GBT does not argue otherwise. (DA Ex. 28, ¶¶ 237-268, 304.) ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

As the inventor testimony illustrates, the TR46.1 submissions are not a "complete thought expressed in such clear terms as *to enable those skilled in the art to make the invention*." *Kridl*, 105 F.3d at 1449-50. To the contrary, the TR46.1 submissions provide at most only vague *functional goals*, not an enabling description or sufficient evidence of conception. *See also Northpoint Tech. v. The DirectTV Group,* 09-CV-506-JRN, slip op, at 9-10 (W.D. Tex. June 17, 2011), *aff'd* No. 2011-1524 (Fed. Cir. May 11, 2012) (granting summary judgment where "the [inventors] possessed nothing more than a general goal for creating that system; conception demands much more") (copies attached hereto as Exs. A and B).

---

[5] The TR46.1 documents propose ramping within a ***single preamble*** of length n x 1024. (PA42 ("The length of the preamble sequence is adjustable. For the RACH it is n x 1024 chips.").)

### c.   GBT's post-critical date TR46.1 submissions are legally irrelevant and support Apple's motion in any event.

GBT argues that a November 10-11, 1998 presentation—written and presented over one month *after* the critical date—corroborates GBT's conception.  (D.I. 239 at 15.)  However, an inventor cannot (1) corroborate late documents by alleging that they show features that existed before the critical date, and then (2) use those late documents to corroborate an earlier invention date.  *In re NTP, Inc.,* 654 F.3d 1279, 1291-1292 (Fed. Cir. 2011) ("The problem with NTP's argument is that it is circular.  The affiants seek to corroborate their testimony with the Telefind document, but, at the same time, attempt to corroborate the date of the document with their testimony.").  In any event, the November 1998 document only supports summary judgment of invalidity, as it does *not* show that the claimed invention was GBT's idea ███████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████

GBT argues that another post-critical date TR 46.1 submission, dated October 27, 1998, corroborates GBT's prior conception.  (D.I. 239 at 14.)  However, GBT admits that the October 27th document reflects work that Parsa and Kanterakis performed between October 8 and October 27, which is indisputably *after* Ericsson's October 5 patent filing.  (D.I. 239 at 14.)  Thus, GBT cannot use the October 27th submission to corroborate an earlier invention date.  *NTP,* 654 F.3d at 1291.  In any event, even if the October 27th submission could be considered, the document does not support an early conception date.  To the contrary, the document shows that until at least October 27th, Parsa and Kanterakis were still promoting Parsa's rapid ramping preamble concept, which is fundamentally *different* than the claimed inventions.  (D.I. 219 at 13.)



### 5.   Vojcic's conclusory opinion cannot overcome GBT's many admissions or defeat summary judgment.

Without any corroborating evidence, GBT points to Vojcic's conclusory opinion that GBT conceived first. (D.I. 239 (*passim*).)  GBT inexplicably argues that Apple "waived" any challenge to Vojcic (D.I. 239 at 24), but Vojcic's conclusory opinion merely recites the same evidence and attorney arguments that Apple already addressed and rebutted in its opening brief. Although Vojcic's conclusory opinions are unreliable and inadmissible under *Daubert*, the Court does not need to resolve Apple's forthcoming *Daubert* motion to grant summary judgment. A

---

6  

conclusory expert opinion cannot overcome party and inventor admissions and create a genuine issue of material fact. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001) (affirming grant of summary judgment and finding that the district court correctly relied on the inventor's admissions: "Broad conclusory statements offered by Telemac's experts are not evidence and are not sufficient to establish a genuine issue of fact."). *See also Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997) (affirming summary judgment of invalidity); *Kenexa Brassring*, 751 F. Supp. 2d at 757 n.8 (rejecting attempt to swear behind a filing date and noting that "is well established that conclusory expert declarations without supporting facts do not raise a genuine issue of material fact").

Here, GBT and its witnesses admit that: (1) the Kanterakis drawings were necessary for Dr. Newman to constructively reduce the invention to practice, (2) the Kanterakis drawings did not exist before February 23, 1999, (3) the Parsa notebook is not corroboration, and (4) Parsa's TR46.1 submissions did not provide details of the invention and merely addressed functional goals for the air interface, and even Kanterakis did not understand them. Such admissions are conclusive—GBT does not have evidence of prior conception, or corroborating evidence showing that "the inventor disclosed to others his complete thought expressed in such clear terms as to enable those skilled in the art to make the invention." *Kridl*, 105 F.3d at 1449-50. Summary judgment is required.

**B.     GBT was not diligent for the entire critical period.**

      **1.     GBT concedes that the inventors put the patent "at the bottom" of their priorities list for *over four months*.**

As set forth in Apple's opening brief, GBT's lack of diligence is an independent ground for summary judgment. (D.I. 219 at 28-38; *see also* DA Ex. 28 at § XI.B.) GBT does not dispute that the inventors, Parsa and Kanterakis, were solely responsible for deciding whether

and when to file the application.  (D.I. 219 at 29, §2.)  GBT does not dispute that Parsa put the

invention "at the bottom of my priorities list" and went "in a different direction," leaving any

patent filing to Dr. Kanterakis.  (D.I. 219 at 29-30, §3.)  GBT does not dispute that Kanterakis

did nothing whatsoever to prepare a patent application for months.  (D.I. 219 at 31, §4.)  In fact,

GBT now admits that Kanterakis made "the *initial draft* of the drawings for the '267 application"

on February 23, 1999, *four-and-a-half months* after Ericsson filed the Dalhman application.

(D.I. 239 at 39.)  In other words, GBT has *no evidence* that the inventors did *anything* to patent

the invention for months.  *See Griffith v. Kanamaru,*, 816 F.2d 624, 627 (Fed. Cir. 1987)

(holding that a three-month delay in diligence defeated an attempt to swear behind).

> **2.    GBT's new "engineering diligence" theory is mere lawyer argument
> that GBT's witnesses conclusively refute.**

Unable to show that the inventors were diligent in patenting the invention, GBT argues

that the Court should create a new standards-based exception to the diligence requirement.

According to GBT, Parsa's work on *unrelated* parts of the WCDMA standard was "required" to

reduce the claimed invention to practice, and thus, counts as "engineering diligence."  (D.I. 239

at 33-34.)  No Court has embraced GBT's new standards-based exception, and even under

GBT's new law, GBT does not even attempt to address, much less distinguish, the admissions of

Yuen (GBT CEO), Vojcic (GBT expert), and Parsa (GBT inventor).  (D.I. 219 at 34-35.)



Vojcic                   , testifying that the

TR46.1 addressed compatibility, *not* the design or implementation of the claimed devices.  (D.I.

219 at 34-35 (quoting DA Ex. 20, Vojcic Tr. 369:18-370:15 ("[T]he design of these devices is

not subject, actually, of these standardization procedures.").))

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

GBT ignores these dispositive admissions. Instead, GBT proclaims that Vojcic's expert report states that "the work performed by Parsa and Kanterakis was necessary to reduce the invention to practice." (D.I. 239 at 36 (citing PA-17, 63-79 ¶¶2, 91-141).) Vojcic's report says no such thing. The report does not state that Parsa and Kanterakis' work "was *necessary* to reduce the invention to practice." To the contrary, Vojcic's report states only that the invention was intended to work as "part" of a larger network. (*E.g.,* PA-17, ¶2 (referring to work on "the claimed invention *as well as the larger wireless network and network protocols of which the claimed invention was a part*") (emphasis added).)

No evidence suggests that GBT's post-critical date attendance at standards meetings was "necessary" to reduce the invention to practice. ████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ Thus, this case is nothing like *Keizer*, *Watkins*, and *Scott*, cited in GBT's opposition, where the patentees actually worked to build and test the claimed invention. (D.I. 239 at 34-35.)[8] In fact, *Watkins* cautioned that an inventor is *not* diligent where "the inventor or his representatives deliberately refrained from making an adequately meaningful test readily within their immediate abilities solely on the ground of convenience." *Watkins v. Wakefield*, 443 F.2d 1207, 1210 (CCPA 1971). That is what happened

---

[7] GBT's alleged "engineering diligence" evidence has unaccounted for gaps. ██████████
████████████████████████████████████████████████████████

[8] In *Keizer*, for instance, the patentee was *actually building* the receiver necessary to test the invention. *Keizer v. Bradley*, 270 F.2d 396, 398-99 (CCPA 1959) ("[T]here was no other way to get such a receiver.").

here, as Yuen and GBT's diligence expert concede. (D.I. 219 at 39 (discussing Garner admissions re: GBT's desire to save money).) Summary judgment is required.

> **3.   GBT's new "attorney diligence" evidence is inadmissible and cannot defeat summary judgment.**

Although GBT has no evidence of diligence for four-and-a-half months, GBT argues that at least Dr. Newman, who drafted the application, was diligent for the *last month*, from February 23, 1999 to March 22, 1999. Even if that were true, attorney diligence for only the final month cannot salvage the patents—GBT must present diligence for the *entire* critical period. In any event, as GBT's diligence expert concedes: "We do not have the records of what attorney Newman actually did and when he did it." (PA852 ¶72.)

Without any evidence in the record, GBT apparently searched through previously-undisclosed GBT evidence, and found the original draft Kanterakis drawings. GBT produces a new declaration from Kanterakis, purporting to attach *completely redacted* pages that allegedly include the first drafts of the invention drawings, allegedly drawn on February 23, 1999. (D.I. 239 at 39-40; PA733-740 (completely redacted as allegedly "privileged").)[9] GBT's new evidence, which GBT did not produce or log as privileged during discovery, is inadmissible. First, the original Kanterakis drawings were indisputably some of the most critical information in the case. The drawings should have been produced, or if GBT intended to argue privilege, listed on a privilege log. Second, if GBT intended to argue for a date of invention earlier than its March 22, 1999 filing date, GBT should have (1) produced *unredacted copies* of all prefiling documents relating to conception and diligence, and (2) allowed Apple to depose the inventors, the prosecuting attorney, and any other relevant witness regarding those documents. *See, e.g.,*

---

[9] GBT never logged the documents and thus waived any privilege over them, if a privilege ever existed. Kanterakis sent the drawings *to Kanterakis' secretary*, not to a lawyer. (PA732.)

*Katz v. AT&T Corp.*, 191 F.R.D. 433, 441 (E.D. Pa. 2000); *S.O.I.TEC Silcon on Insulator Techs.*

*v. MEMC Elec. Materials, Inc.*, C.A. N o. 05-806-GMS, D.I. 114, slip op. at 1-2 (D. Del. Mar.

13, 2008) (copy attached as Ex. C).  GBT did not log the drawings or produce them.

The law does not allow GBT to use the privilege as a sword and a shield, disclosing only the

parts of the conception record that GBT deems favorable.  *See, e.g., In re Echostar Comm'n*

*Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006); *Brigham and Women's Hosp. Inc. v. Teva Pharma.*

*USA*, 707 F. Supp. 2d 463 (D. Del. 2010) ("cannot have it both ways").  The Court should

exclude Kanterakis' new declaration and strike GBT's attempt to use it to establish attorney

diligence.  The Court should also exclude the expert reports of GBT's diligence expert Garner,

who admits that "We do not have the records of what attorney Newman actually did and when he

did it" and thus, offers nothing more than speculation and surmise.  (PA-852 ¶72.)  As GBT has

no admissible attorney diligence evidence, summary judgment is required.

## III.   CONCLUSION

GBT admits that it did not have the "necessary information" for Dr. Newman, a PhD and

former Electrical Engineering Professor, to reduce the invention to practice until February 23,

1999, four-and-a-half months too late.  GBT further concedes that Parsa and Kanterakis did not

work on the patent application until 1999—after months of no diligence—providing an

independent basis for summary judgment.  GBT's opposition raises only a series of

smokescreens that do not raise any triable issue of fact.  Summary judgment is required.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Timothy S. Teter
Lowell Mead
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Tel:  (650) 843-5000

By:  /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza 6th Floor
    1313 N. Market Street
    Wilmington, DE  19899
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

Dated:  January 11, 2013
Public Version Dated: January 18, 2013
1089684 / 35716

*Attorneys for Defendant Apple Inc.*

21

# EXHIBIT A

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS 2011 JUN 17 PM 2: 43
AUSTIN DIVISION

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY

| | | |
|---|---|---|
| NORTHPOINT TECHNOLOGY, LTD., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 09-CV-506-JRN |
| | § | |
| THE DIRECTV GROUP, INC., et. al. | § | |
| Defendants. | § | |
| | § | |

## ORDER GRANTING DIRECTV INC.'S MOTION FOR SUMMARY JUDGMENT

Before the Court in the above-entitled and styled cause of action are Defendant DirecTV, Inc.'s Motion for Summary Judgment of Invalidity (Clerk's Dkt. # 114); Plaintiff Northpoint Technology, Ltd.'s Opposition to DirecTV, Inc.'s Motion for Summary Judgment of Invalidity (Clerk's Dkt. # 125); DirecTV's Reply in Support of its Motion for Summary Judgment of Invalidity (Clerk's Dkt. # 130); and Defendants EchoStar Technologies LLC's and Dish Network LLC's Notice to Join in DitecTV's Motion for Summary Judgment Regarding Conception Date (Clerk's Dkt. # 119). After reviewing these motions, and receiving the Special Master's technical advice and approval (Clerk's Dkt. # 106), the Court **GRANTS** DirecTV's Motion (Clerk's Dkt. # 114) **IN PART**. Specifically, the Court finds that (1) the Eastman Patent anticipates claims 1, 7, 8, 14, 15, 16, 18, and 19 of Northpoint's '636 Patent, rendering those claims invalid; and (2) Northpoint's conception date for the '636 Patent is not prior to the February 27, 1997 filing date of the Eastman Patent. The Court does not consider whether the Lusignan Patent anticipates the '636 Patent's claims.

## Facts

When a homeowner subscribes to satellite television, a technician shows up, installs a

satellite dish and a television box, and then he gives you a new controller. At a general level, this lawsuit involves a patent on those satellite dishes and the equipment that accompanies them.

The patent at issue in this case spawned from two engineers, Carmen and Saleem Tawil. This couple spent years developing various products that would complement the Direct Broadcast Satellite industry. On May 28, 1998, the Tawils filed a patent for a digital satellite televison system that can receive and process data streams that carry different information but share overlapping frequencies. By creating a device to accommodate two data streams that would otherwise interfere with one another, the Tawils were offering customers greater access to channels without the need of additional satellite receivers or satellite boxes. On March 27, 2001, the Patent and Trademark Office issued United States Patent Number 6,208,636. By that time, all rights in the '636 Patent had already been assigned to Northpoint.

Northpoint now contends that all of the defendants in this case have infringed on the '636 Patent as a result of their involvement in the satellite television business. The defendants deny infringement and also claim that the '636 Patent is invalid because it is both obvious and anticipated. Here, the Court reviews only the anticipation argument with regard to the Eastman Patent.

<u>Reasoning</u>

In its Motion for Summary Judgment, DirecTV argues that the Eastman Patent anticipates claims 1, 7, 8, 14, 15, 16, 18, and 19 of the '636 Patent; the Court agrees. Furthermore, Northpoint cannot prove that the Tawils conceived of the '636 Patent prior to the date that the Eastman Patent was filed. As a consequence, DirecTV's Motion for Summary Judgment, with respect to the Eastman Patent, is granted.

**A. The Eastman Patent anticipates the '636 Patent**

     The Eastman Patent anticipates all of the asserted claims of the '636 Patent.  The Eastman

Patent is also prior art as it was filed with the PTO on February 27, 1997, over a year prior to the

May 28, 1998 filing date of the '636 Patent.  A patent is invalid for anticipation if a single prior art

reference discloses each and every limitation of the claimed invention.  *See Lewmar Marine, Inc. v.*

*Barient, Inc.*, 827 F.2d 744, 747 (Fed. Cir. 1987).  Moreover, a prior art reference may anticipate

without disclosing a feature of the claimed invention if that missing characteristic is necessarily

present, or inherent, in the single anticipating reference. *See Continental Can Co. v. Monsanto Co.*,

948 F.2d 1264, 1268 (Fed. Cir. 1991).  Although anticipation is a question of fact, it may be decided

on summary judgment if the record reveals no genuine dispute of material fact. *See Leggett & Platt,*

*Inc. v. VUTEK, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008) (citations and quotations omitted).

DirecTV supports its anticipation argument with its invalidity contentions (Clerk's Dkt. # 115, Ex.

H, I) and with the declaration of its expert, Bruce Elbert (Clerk's Dkt. # 144, Ex. C).  After

thoroughly reviewing these documents as well as the Eastman Patent (Clerk's Dkt. # 114, Ex. D),

the '636 Patent (Clerk's Dkt. # 114, Ex. A), and the Kanda Patent (Clerk's Dkt. # 114, Ex. E), the

Court finds by clear and convincing evidence that claims 1, 7, 8, 14, 15, 16, 18, and 19 of the '636

Patent (all of the asserted claims) are invalid due to anticipation.

     **i. Northpoint conceded that the Eastman Patent anticipates all of the claims of the '636**

**Patent**

     Further support for DirecTV's invalidity argument, and the Court's decision, comes from

Northpoint's court-ordered response to a binding interrogatory.  In its Interrogatory No. 2, DirecTV

specifically asked Northpoint to identify any element in the '636 Patent that was missing from the

Eastman Patent. (Clerk's Dkt. # 116, Ex. L). After Northpoint continually failed to provide an adequate response, Magistrate Judge Pitman ordered Northpoint to "Fully Answer." (Clerk's Dkt. # 82 at 1). When the answer came in, Northpoint did not contend that any element from the Eastman Patent was missing. Rather, the sole response was "[b]ased on Northpoint's earlier date of invention,[the Eastman Patent] is not prior art to the Northpoint '636 patent." (Clerk's Dkt. # 116, Ex. L). Significantly, there was no equivocation from this response until DirecTV filed its motion for summary judgment.

When DirecTV filed its Motion for Summary Judgment asserting that the Eastman Patent anticipated all of the asserted claims of the '636 Patent, Northpoint unconvincingly changed its tune. Northpoint argued in a page-length paragraph that several elements of the '636 Patent are missing from the Eastman Patent. *See* (Clerk's Dkt. # 125 at 3–4). Throughout its argument, Northpoint did not address the fact that it previously made no mention of the Eastman Patent's missing elements in its court-ordered interrogatory. Moreover, Northpoint's opposition relies only on conclusory attorney argument instead of admissible evidence. *See id.* Ultimately, this effort appears to be a last-minute attempt to muddy the waters and survive a motion for summary judgment.

But the Court is not persuaded by Northpoint's argument. After reviewing the summary judgment record, the Court finds that the Eastman Patent discloses all of the asserted claims from the '636 Patent. Indeed, the Court agrees with Northpoint's response to DirecTV's Interrogatory No. 2: the only issue is whether the Tawils can prove conception of the '636 Patent before the Eastman Patent was filed. *See* (Clerk's Dkt. # 116, Ex. L). This leads into the discussion of conception.

**B. Northpoint's Conception Argument Fails**

Northpoint cannot show conception of the '636 Patent prior to the February 27, 1997 filing

4

date of the Eastman Patent. Northpoint argues that the Tawils conceived of the '636 Patent around September of 1996. *See* (Clerk's Dkt. # 125 at 5–7). This contention fails for two reasons. First, inventor testimony (Mrs. Tawil's) lays the foundation for Northpoint's conception argument. But inventor testimony must be corroborated. The documents cited by Northpoint do not corroborate Mrs. Tawil's testimony. And second, even if the documents cited by Northpoint did corroborate Mrs. Tawil's testimony, they do not describe the limitations of the '636 Patent with sufficient particularity to establish a conception date prior to the filing of the Eastman Patent. At the end of the day, Northpoint's attempt to revive the '636 Patent on the grounds of prior conception does not convince.

   As an important aside, Northpoint's Second Amended Complaint states:

> In 1997, the Tawils realized that in order to fully implement their technology, they needed to develop a system capable of receiving two signals simultaneously. This realization led ultimately to the inventions described in the '636 Patent.

(Clerk's Dkt. # 22 at 3). The factual allegations set forth in Northpoint's complaint are binding, even if they contradict sworn affidavits or interrogatory responses. *Davis v. A.G. Edwards & Sons, Inc.*, 823 F.2d 105, 108 (5th Cir. 1987). How could the Tawils have concieved of the '636 Patent in 1996 if the realization leading to the '636 Patent took place in 1997? In light of this contradiction, Northpoint's argument that it conceived of the '636 Patent prior to 1997 falls flat on its face. But more generally, Northpoint's current attempt to establish a conception date in 1996 mirrors the 180 Northpoint pulled regarding whether the Eastman Patent anticipates the '636 Patent's claims. This sort of conduct is troubling.

### i. Northpoint's inventor testimony requires corroboration

   At the heart of Northpoint's conception argument is Carmen Tawil's deposition testimony.

5

In her deposition, Mrs. Tawil states that she and her husband conceived of the '636 Patent "at least as early as September 16, 1996." *See* (Clerk's Dkt. # 125, Ex. F). But Mrs. Tawil's testimony alone is not enough. Corroboration is required where a party seeks to show conception through the oral testimony of an inventor. *See Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993). This requirement arose out of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent. *See Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 60 (1923); *accord Deering v. Winona Harvester Works*, 155 U.S. 286, 300–01 (1894); *The Barbed Wire Patent*, 143 U.S. 275, 284–85 (1892); *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 776 (Fed. Cir. 1995); *New Idea Farm Equip. Corp. v. Sperry Corp.*, 916 F.2d 1561, 1567 (Fed. Cir. 1990). Although perhaps prophylactic in application given the unique abilities of trial court judges and juries to assess credibility, the rule provides a bright line for both district courts and the PTO to follow in addressing the difficult issues related to invention dates. In assessing corroboration of oral testimony, courts apply a rule of reason analysis. *Price*, 988 F.2d at 1195. Under a rule of reason analysis, "[a]n evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Id.* Thus, the Court must focus its inquiry on whether Northpoint can corroborate Mrs. Tawil's story.

### ii. There is no indication that Northpoint's corroborating evidence discusses the '636 Patent

Northpoint cannot corroborate Mrs. Tawil's testimony. But it makes an attempt with three documents: (1) a faxed letter dated September 18, 1996 from Carmen Tawil to Russ Culbertson (the Tawils' patent prosecutor) (Clerk's Dkt. # 125, Ex. B); (2) a letter dated September 25, 1996 from

6

Russ Culbertson to the Tawils (Clerk's Dkt. # 125, Ex. C); and (3) Russ Culbertson's activity-log notes recounting phone conversations with Mrs. Tawil on September 26 and 27, 1996 (Clerk's Dkt. # 125, Ex. D). None of this evidence—except possibly one line from Russ Culbertson's activity log—discusses the '636 Patent. This lack of corroboration is apparent when Northpoint's evidence is read along with two documents: (1) the testimony of the Tawils's patent prosecutor, Russ Culbertson (Clerk's Dkt. # 114, Ex. G); and (2) Northpoint's response to DirecTV's Interrogatory No. 14 (Clerk's Dkt. # 125, Ex. G).

Looking first at Northpoint's response to Interrogatory No. 14, it does not clarify the Tawil's inventive process with regard to the '636 Patent. Instead, it describes their general efforts to make improvements in the world of DBS satellite technology. *See id.* Essentially, Northpoint's response carves a nebulous description that does not distinguish between the "multiple applications for patent protection on various inventions related to . . . co-frequency technology." *See id.* at ¶ 13.

Turning next to Russ Culbertson's filing habits, the letters corroborating Mrs. Tawil's testimony regarding the '636 Patent were not found where one would expect them to be found—in the '636 Patent file. Instead, they were found in a "miscellaneous" file. *See* (Clerk's Dkt. # 114, Ex. G). So the file containing Northpoint's corroborating evidence in no way indicates that the documents it contains have anything to do with the '636 Patent. In fact, the earliest entry date in the actual '636 Patent file was April 14, 1998, 18 months after the letters Northpoint relies upon to show corroboration. *See id.* But more telling than the patent prosecutor's filing habits is what the patent prosecutor concluded when reviewing Northpoint's corroborating evidence.

According to Mr. Culbertson—the patent prosecutor for the '636, '663, and '605 Patents—none of Northpoint's corroborating documents refer to the '636 Patent. *See id.* When

reviewing Mrs. Tawil's September 18, 1996 letter, Mr. Culbertson determined that it was referring to the "already existing" '663 Patent. *See id.* And when reviewing his own September 25, 1996 letter, Mr. Culbertson concluded that it referred to the '605 Patent, which was filed on October 11, 1996. *See id.* It turns out, October 11, 1996 is one day before the filing deadline—October 12, 1996—that Mr. Culbertson's activity log indicates he discussed with Carmen Tawil on September 25, 1996. *See id.* So both letters and one of the two relevant references in Mr. Culbertson's activity log do not discuss the '636 Patent.

What remains of Northpoint's corroborating evidence is one line from Mr. Culbertson's activity log. This line recounts a September 27, 1996 phone conversation with Carmen Tawil and states that "[t]hey want to file a new application to claim simultaneous reception on the same frequency." *See* (Clerk's Dkt. # 125, Ex. D). Of course, there is no telling which Patent this single line refers to. Consider again Northpoint's explanation that during this general time frame the Tawlis were engaged in "multiple applications for patent protection on various inventions related to . . . co-frequency technology." *See* (Clerk's Dkt. # 125, Ex. G, ¶ 13). However, if there is any corroborating evidence for the '636 Patent, this single line is the extent of it. Everything else Northpoint relies upon refers to other patents.

### iii. Even if Northpoint's corroborating evidence refers to the '636 Patent, it does not disclose the elements of the '636 Patent with sufficient particularity to establish conception prior to the February 27, 1997 filing of the Eastman Patent

Even if all of Northpoint's evidence corroborates Mrs. Tawil's testimony regarding the '636 Patent, none of the documents describe the '636 Patent with sufficient particularity to establish conception prior to the filing of the Eastman Patent. At best, all of the evidence Northpoint uses to

support its conception argument shows a general goal for creating a satellite system that eventually matured into the '636 patent; this is insufficient. Conception requires "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (citation omitted). Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation. *See Sewall v. Walters,* 21 F.3d 411, 415 (Fed. Cir. 1994); *see also Coleman v. Dines,* 754 F.2d 353, 359 (Fed. Cir. 1985) (conception must include every feature of claimed invention). Here, none of the evidence produced by Northpoint satisfies the particularity requirement for conception. Indeed, none of the three documents cited by Northpoint discuss any of the following limitations from the '636 Patent: (1) "a first switch connected to a first input;" (2) "a second switch connected to a second input;" (3) "a data stream junction;" (4) "a controller for receiving a channel select input;" or (5) "a memory device operatively connected to the controller". But for argument's sake, the Court will briefly review Northpoint's evidence to determine whether is it shows conception.

The Court starts with the only evidence that could be considered a corroborating reference for the '636 Patent—the single line Mr. Culbertson wrote in his activity log recounting a conversation with Mrs. Tawil on September 27, 1996. *See* (Clerk's Dkt. # 125, Ex. D). Again, that single line states, "Telephone conference with Carmen, they want to file a new application to claim simultaneous reception on the same frequency." *Id.* This line, at most, identifies a general goal, not "the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Hybritech Inc. v. Monoclonal*

9

*Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed. Cir. 1986) (citation omitted). "[A] new application to claim simultaneous reception on the same frequency" does not mention at least the following limitations set forth in the '636 Patent: (1) "a first switch connected to a first input;" (2) "a second switch connected to a second input;" (3) "a data stream junctionl;" or (4) "a controller for receiving a channel select input." Moreover, it is especially difficult to figure out how that one-line reference to "simultaneous reception on the same frequency" can demonstrate conception of "a memory device operatively connected to the controller". Indeed, the memory element of the '636 Patent was not part of the original '636 application, but was added only in an effort to overcome the PTO examiner's rejection of the '636 Patent. *See* (Clerk's Dkt. # 116, Ex. N). The point is, the single-line reference from September 27, 1996, which might refer to the '636 Patent, shows that the Tawil's possessed nothing more than a general goal for creating that system; conception demands much more.

The rest of Northpoint's evidence, which the Court already determined does not refer to the '636 Patent, also fails to meet the particularity standard for conception. Neither the September 18, 1996 letter from Mrs. Tawil, nor the September 25, 1996 letter from Mr. Culbertson, disclose any of the above-mentioned limitations. Adding further support, Mr. Culbertson, the attorney who prosecuted the '636 Patent, testified that both letters were missing numerous limitations of the '636 Patent. *See* (Clerk's Dkt. #114, Ex. G). Thus, even if Northpoint's evidence did corroborate Mrs. Tawil's testimony, it simply does not disclose enough information about the '636 Patent to satisfy the requirement for conception.

## Conclusion

After thoroughly reviewing the Parties' arguments and the summary judgment record, the

10

Court finds that the Eastman Patent anticipates claims 1, 7, 8, 14, 15, 16, 18, and 19 of Northpoint's

'636 Patent, rendering those claims invalid.  The Court also finds that Northpoint's conception date

for the '636 Patent is not prior to the February 27, 1997 filing date of the Eastman Patent.

Accordingly, DirecTV's Motion for Summary Judgement is **GRANTED** in **PART**.  The Court does

not consider whether the Lusignan Patent anticipates the '636 Patent.

IT IS SO ORDERED this _19TH_ day of June, 2011.

James R. Nowlin
UNITED STATES DISTRICT JUDGE

11

# EXHIBIT B

*Judge Nowlin*

RECEIVED

MAY 1 4 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
      DEPUTY CLERK

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

FILED

MAY 1 4 2012

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
        DEPUTY CLERK

## NORTHPOINT TECHNOLOGY, LTD.,
*Plaintiff-Appellant,*

v.

## DIRECTV, INC.,
*Defendant-Appellee,*

AND

## DISH NETWORK LLC AND
## ECHOSTAR TECHNOLOGIES, LLC,
*Defendants-Appellees.*

_____

2011-1524

_____

Appeal from the United States District Court for the Western District of Texas No. 09-CV-0506, Judge James R. Nowlin.

_____

## JUDGMENT

_____

ALISA A. LIPSKI, Goldstein & Lipski, PLLC, of Houston, Texas, argued for the plaintiff-appellant. With her on the brief was EDWARD W. GOLDSTEIN.

ALEXANDER F. MACKINNON, Kirkland & Ellis, LLP, of Los Angeles, California, argued for all defendants-appellees. With him on the brief were R. ALEXANDER PILMER; and DENNIS J. ABDELNOUR, of Washington, DC, for defendant-appellee DirecTV, Inc. Of counsel was GUY RUTTENBERG, of Los Angeles, California.

RACHEL KREVANS, Morrison & Foerster, LLP, of San Francisco, California, for defendants-appellees, Dish Network LLC and EchoStar Technologies, LLC. With her on the brief were JASON A. CROTTY, MATTHEW A. CHIVVIS, and DIANA B. KRUZE.

————————————

THIS CAUSE having been heard and considered, it is

ORDERED and ADJUDGED:

PER CURIAM (PROST, MOORE, and WALLACH, *Circuit Judges*).

### AFFIRMED. *See* Fed. Cir. R. 36.

ENTERED BY ORDER OF THE COURT

May 11, 2012
Date

*Jan Horbaly* /ja

Jan Horbaly
Clerk

**FILED**
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

MAY 1 1 2012

JAN HORBALY
CLERK

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| S.O.I.TEC SILCON ON INSULATOR TECHNOLOGIES S.A. and SOITEC USA, Inc., | ) ) ) | Case No. 1:05-cv-00806 (GMS) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| MEMC ELECTRONIC MATERIALS, INC., | ) ) | |
| Defendant. | ) ) | |

### REVISED [PROPOSED] ORDER

On February 28, 2008, at 10:30 a.m., this Court heard argument on motion by Plaintiffs

S.O.I.TEC SILCON ON INSULATOR TECHNOLOGIES S.A. and SOITEC USA, Inc.

(collectively "Soitec") to address certain discovery disputes with Defendant MEMC Electronic

Materials, Inc. ("MEMC"). Based upon the papers filed by the parties, and upon oral argument

by all parties, the Court finds as follows:

1. Soitec's motion to preclude the use by MEMC of Dr. George Rozgonyi as an expert
   or consultant in this action should be and is hereby DENIED.

2. Soitec's motion to compel the production of documents and additional testimony
   concerning the conception of any inventions embodied or disclosed in United States
   Patent No. 6,236,104 should be and is hereby granted GRANTED. Specifically, this
   Court finds that MEMC has waived any privilege with respect to any such
   conception. MEMC shall produce Edward Hejlek and Dr. Robert Falster for
   additional deposition testimony on that subject. MEMC shall also produce to Soitec

unredacted copies of the invention disclosure statements relating to the '104 patent, which are identified as entries 43 and 46 on Senniger Power's privilege log.

3. Soitec's motion to compel the production of documents and information concerning MEMC's testing and analysis of Soitec wafers seized in connection with pending French litigation between Soitec and MEMC should be and hereby is GRANTED in part and DENIED in part. Subject to its prior agreement, MEMC shall produce the raw data resulting from or underlying such testing and analysis. MEMC shall also immediately produce to the Court for *in camera* inspection unredacted copies of the summary and/or analysis of such testing prepared by MEMC employees. This Court will review the summary and/or analysis and determine what portions, if any, should be produced to Soitec within 5 business days of the entry of any additional Order regarding production.

**SO ORDERED**, this _13_ day of _March_, 2008.

Mary Pat Thynge
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

**CERTIFICATE OF SERVICE**

I, David E. Moore, hereby certify that on January 18, 2013, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on January 18, 2013, the attached document was electronically

mailed to the following person(s)

Michael Kelly
Thomas A. Stevens
Daniel M. Silver
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
mkelly@mccarter.com
thstevens@mccarter.com
dsilver@mccarter.com
*Attorneys for Plaintiff
Golden Bridge Technology Inc.*

Mark D. Giarrantana
Eric E. Grondahl
Mccarter & English, LLP
City Place I
185 Asylum Street
Hartford, CT 06103
mgiarrantana@mccarter.com
egrondahl@mccarter.com
*Attorneys for Plaintiff
Golden Bridge Technology Inc.*

Jack B. Blumenfeld
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19899
jblumenfeld@mnat.com
*Attorneys for Defendant Motorola Mobility
LLC*

K. James Sangston
Vanessa M. Blake
Mitchell G. Stockwell
Kilpatrick Stockton, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
JSangston@KilpatrickStockton.com
VBlake@KilpatrickStockton.com
MStockwell@KilpatrickStockton.com
*Attorneys for Defendant Motorola Mobility
LLC*

/s/ David E. Moore
Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

971919/35716